47 A.3d 797

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Calvin HENDERSON, Appellant.**

Supreme Court of Pennsylvania.

Argued April 13, 2010.

Decided April 25, 2012.

278

Frankie C. Walker, II, for Calvin Henderson.

Leonard Sosnov, David Rudovsky, Kairys, Rudovsky, Messing & Feinberg, Philadelphia, for ACLU and ACLU of Pennsylvania.

David R. Crowley, for Pennsylvania Association of Criminal Defense Lawyers.

Michael Wayne Streily, Francesco Lino Nepa, Allegheny County District Attorney's Office, for Commonwealth.

CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## *OPINION*

Justice SAYLOR.*

In this appeal arising in the suppression context, we consider Pennsylvania's unique variant of the independent source rule, deriving from *Commonwealth v. Mason*, 535 Pa. 560, 637 A.2d 251 (1993).

Law enforcement officers suspected that Appellant may have co-perpetrated a violent rape-kidnapping. They sought samples of his DNA for comparison with material obtained from the victim and a vehicle used in the commission of the crimes. Detective Johnson, a member of a police sexual assault unit, prepared an affidavit in support of probable

* This matter was reassigned to this author.

cause; secured a magistrate's approval of a search warrant;[1] and collected samples of Appellant's blood, hair, and saliva. The ensuing DNA analysis implicated Appellant, and he was charged with kidnapping, rape, and other offenses.

Appellant lodged a pretrial motion to suppress on the ground that the detective's affidavit was insufficient to establish probable cause. *See generally Kohl*, 532 Pa. at 166, 615 A.2d at 315 ("Generally, a search or seizure is not reasonable unless it is conducted pursuant to a search warrant issued by a magistrate upon a showing of probable cause."). Accordingly, Appellant contended, the seizures from his body violated his rights under the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution.[2]

The motion apparently raised concerns on the prosecution's part, as a decision was made to secure a second warrant. The strategy was to invoke the independent source doctrine as applied under Pennsylvania's Article I, Section 8 jurisprudence, deriving from *Mason*. Under this rule, evidence tainted by illegal police conduct (such as an unlawful seizure) nevertheless may be admitted into evidence if the evidence can be fairly regarded as having an origin independent of the unlawful conduct. *See Mason*, 535 Pa. at 565–68, 637 A.2d at 254–55; *see also Commonwealth v. Melilli*, 521 Pa. 405, 420, 555 A.2d 1254, 1262 (1989) ("If the prosecution can demonstrate that the [challenged] evidence was procured from an independent origin—a means other than the tainted sources—

---

1. *See generally Commonwealth v. Kohl*, 532 Pa. 152, 166, 615 A.2d 308, 315 (1992) (explaining that the administration of a blood test performed by or at the direction of the government is a search).

2. *See generally Weeks v. United States*, 232 U.S. 383, 398, 34 S.Ct. 341, 346, 58 L.Ed. 652 (1914) (implementing the exclusionary rule precluding the federal courts from admitting evidence procured in violation of an accused's Fourth Amendment rights); *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081 (1961) (holding that, per the Fourteenth Amendment, "all evidence obtained by searches and seizures in violation of the Constitution is, by that same authority, inadmissible in a state court"); *Commonwealth v. Gordon*, 546 Pa. 65, 71, 683 A.2d 253, 256 (1996) (explaining that the exclusionary rule also operates to enforce rights under Article I, Section 8 of the Pennsylvania Constitution).

the evidence will be admissible.").[3] Pursuant to the doctrine as it subsequently evolved in *Commonwealth v. Melendez*, 544 Pa. 323, 676 A.2d 226 (1996), the independent source is to be *"truly independent from both the tainted evidence and the police or investigative team which engaged in the misconduct by which the tainted evidence was discovered."* *Id.* at 334, 676 A.2d at 231 (quoting *Mason*, 535 Pa. at 573, 637 A.2d at 257–58 (Cappy, J., concurring)) (emphasis in original).[4]

Another member of the police sexual assault unit, Detective Evans, was tasked with undertaking a probable-cause investigation to support a second search warrant. Detective Evans spoke with Detective Johnson, reviewed the existing case file and the victim's medical records, conducted an inquiry into Appellant's background, and interviewed one collateral witness. He then applied for and secured a second warrant, which was used to seize an additional sample of blood from Appellant.

**3.** To this extent at least, the approach under the Pennsylvania Constitution overlaps with federal constitutional jurisprudence. In *Murray v. United States*, 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988), the United States Supreme Court explained that the exclusionary rule prohibits introduction of evidence obtained during an unlawful search, as well as any "derivative evidence ... up to the point at which the connection with the unlawful search becomes 'so attenuated as to dissipate the taint.' " *Id.* at 536–37, 108 S.Ct. at 2533 (quoting *Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939)); *see also Segura v. United States*, 468 U.S. 796, 804, 104 S.Ct. 3380, 3385, 82 L.Ed.2d 599 (1984) (referring to derivative evidence as "fruit of the poisonous tree" (internal quotation marks and citation omitted)). However, the High Court stated, if certain facts initially become known to police who act illegally, those facts do not become "sacred and inaccessible," but rather, remain subject to admission so long as they are later discovered through a valid search warrant that is not based on the knowledge originally obtained by illegal means. *Murray*, 487 U.S. at 538, 108 S.Ct. at 2534 (quoting Holmes, J., in *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319 (1920)). This Court initially followed *Murray* in *Commonwealth v. Brundidge*, 533 Pa. 167, 620 A.2d 1115 (1993).

**4.** In this regard, the *Melendez* litmus differs from the federal approach, which focuses, more narrowly, on whether the decision to seek a warrant was prompted by something attained as a result of unlawful government conduct, and whether the approving magistrate had been informed of the improperly obtained information. *See Murray*, 487 U.S. at 542, 108 S.Ct. at 2536.

In response, Appellant filed a second suppression motion. In it, he asserted that the evidence secured under the second warrant was not the product of an independent source. According to the motion, the "vast majority" of the information contained in Detective Evans' affidavit derived from the information previously gathered by Detective Johnson. Appellant further highlighted that Detective Evans was commissioned in direct response to the defense's first suppression motion. For these reasons, Appellant contended that the evidence "remains tainted by the original illegally seized evidence."

Detective Evans testified at the hearing on the suppression motions. In the brief direct examination, he indicated that, although he had been a member of the sex assault squad, he did not participate in the original investigation of Appellant's crimes. He explained that he had been tasked with securing a search warrant in March 2006, and, in preparation, he reviewed the reports in the case file, including medical records and crime laboratory reports;[5] conducted an inquiry into Appellant's criminal record; and spoke with a collateral witness. *See* N.T., May 22, 2006, at 53–55. Further, the detective attested that he did not rely on the warrant obtained by Detective Johnson. *See id.* at 56.

On cross-examination, Detective Evans confirmed that he had reviewed the materials assembled by Detective Johnson and had spoken with him. *See id.* at 58–60, 64–65. He also acknowledged that he had reviewed the first warrant and affidavit of probable cause, *see id.* at 57, 61, but he again denied having relied upon the first warrant. *See id.* at 57. The detective conceded that he did not interview the victim, the main eyewitness, or several other witnesses, *see id.* at 63–64, and that the first nine paragraphs of his affidavit "came

5. The record does not specifically indicate whether Detective Evans reviewed the DNA analysis of Appellant's blood secured under the first warrant. *See* N.T., May 22, 2006, at 54–55. He did confirm that the crime lab reports he reviewed included analysis of blood secured from Appellant's codefendant, in which the codefendant was excluded as a contributor to samples recovered from the victim and the vehicle used in perpetration of the crimes. *See id.* at 55.

from" Detective Johnson's investigation. *Id.* at 60.[6] Although he did not agree that his efforts represented a mere expansion on Detective Johnson's work, *see id.* at 63, Detective Evans did say that many aspects of his affidavit derived "[f]rom the people that had done the investigation before" him. *Id.* at 67. Further, the detective confirmed that he at least knew that a motion to suppress was "on the way" at the time he received the assignment to perform a probable-cause investigation. *Id.* at 58.[7]

The suppression court denied Appellant's motions. In relevant part, it ruled that, while Detective Johnson's affidavit was insufficient to support a probable-cause determination, Detective Evans' was adequate and unconnected with the first investigation. According to the court, Detective Evans' affidavit "was a totally separate account of the facts evidence [sic] obtained in the investigation into the kidnapping and rape[,]" and "[n]o causal nexus existed between the blood test results obtained as a result of the first warrant and Detective Evans' Affidavit of Probable Cause dated March 23, 2006." *Commonwealth v. Henderson,* CC 200511250, *slip op.* at 4 (C.P. Allegheny, June 20, 2006). Thus, the suppression court determined that the independent source doctrine was satisfied.

Upon trial, Appellant was convicted of the charged offenses. An appeal ensued, in which the Superior Court affirmed in a memorandum opinion. In its analysis, the intermediate court relied on *Commonwealth v. Smith,* 808 A.2d 215 (Pa.Su-

---

6. Specifically, the following interchange occurred between defense counsel and Detective Evans on cross-examination:

   Q. Now, you will agree with me, if you will, that the first nine paragraphs was all information that you got from Detective Johnson's previous investigations?
   A. You said-the first nine you say.
   Q. Up until the point where you say all the above information was documented and reported under the Pittsburgh Bureau of Police?
   A. Yes, sir.
   Q. So all that information was not obtained by you and that came from Detective Johnson's investigation, am I right?
   A. Yes.
   N.T., May 22, 2006, at 60.

7. In fact, Appellant filed his first motion to suppress two months before Detective Evans began his probable-cause investigation.

per.2002), in which another panel previously accepted, for purposes of the independent source rule, that there may be some degree of overlap between the "independent" police investigation and a prior, tainted one. *See id.* at 221, 223. The court relied on Detective Evans' development of additional evidence with an "independent origin" as establishing that his affidavit was "free of the taint of the first search warrant." *Commonwealth v. Henderson*, No. 903 WDA 2007, *slip op.* at 11–12, 963 A.2d 566 (Pa.Super. Sept. 3, 2008).

■ We allowed a further discretionary appeal to consider whether the independent source doctrine validates a serial search warrant obtained from a second investigation conducted by a police officer from the same department. *See Commonwealth v. Henderson*, 601 Pa. 564, 975 A.2d 1077 (2009) (*per curiam*). The specific probable-cause determinations relative to the two warrants are not presently at issue; here, we accept that—although Detective Johnson's affidavit was inadequate—the affidavit of Detective Evans was sufficient to establish probable cause.[8]

Presently, Appellant maintains that the independent source doctrine cannot pertain, because the suppression record does not establish that Detective Evans' investigation was "truly independent" of Detective Johnson's. To the contrary, Appellant and his *amici,* the Pennsylvania Association of Criminal Defense Lawyers and the American Civil Liberties Union of Pennsylvania, regard the former as "wholly dependent" on the latter. Brief for Appellant at 11. In this respect, Appellant stresses that the detectives were members of the same sex assault unit; they conferred about the case; Detective Evans worked from the preexisting case file; and a substantial portion of Detective Evans' affidavit overlaps with Detective Johnson's. *Accord* Brief for *Amicus* Pa. Ass'n of Criminal Def. Lawyers at 15 ("A truly independent investigation does not occur when officers from the same police department as

8. Also not before us is the argument of *amicus* American Civil Liberties Union of Pennsylvania that the Commonwealth inappropriately introduced into evidence at trial the laboratory report from the first, invalid blood seizure rather than the second, valid one. *See* Brief for *Amicus* ACLU of Pa. at 6 n. 2, 8, 10–11.

the officer who illegally secured the evidence in question secure a new warrant by reviewing the illegal warrant and the reports of the first officer and add a few new facts to the new warrant.").

Appellant also questions the suppression court's finding of the absence of any link between the incriminating DNA test results from the initial blood sample and the second government investigation, given that the prosecution was in possession of the highly incriminatory results at the time such inquiry commenced. Relatedly, he raises fairness concerns associated with the use of the independent source doctrine to sanction serial police investigations motivated by challenges to incriminating evidence obtained pursuant to facially deficient first warrants. To address such concerns, Appellant favors a rule dictating that a second investigation motivated by flaws in a preceding one cannot serve as an independent source, as well as a rebuttable presumption of such motivation arising from spin-off investigations ensuing upon the filing of suppression motions.

The arguments of Appellant and his *amici* underscore the high value placed by this Court on the Pennsylvania Constitution's protection of individual privacy interests, as exemplified in such decisions as *Commonwealth v. Edmunds*, 526 Pa. 374, 394, 586 A.2d 887, 897 (1991) (interpreting Article I, Section 8 "to embody a strong notion of privacy, carefully safeguarded in this Commonwealth for the past two centuries"), and the *Mason/Melendez* line of decisions. In this regard, they observe that Article I, Section 8 has acquired an "identity and vitality ... separate and distinct from that of the Fourth Amendment," Brief for Appellant at 17 (quotation marks and citation omitted), and they stress the broader purpose served by the exclusionary rule under Pennsylvania constitutional law. *Compare, e.g., United States v. Leon*, 468 U.S. 897, 916–18, 104 S.Ct. 3405, 3417–18, 82 L.Ed.2d 677 (1984) (explaining that the sole purpose of the exclusionary rule under Fourth Amendment law is to deter police misconduct, and applying a cost-benefits rationale to support adoption of a good-faith exception), *with Edmunds*, 526 Pa. at 399, 586 A.2d at 899 (rejecting the good-faith exception for purposes of the exclu-

sionary rule as applied in the Article I, Section 8 context, with emphasis on the privacy rationale). *See generally* Brief for *Amicus* Pa. Ass'n of Criminal Def. Lawyers at 10 ("The development of Pennsylvania jurisprudence clearly reveals that this Court has recognized and maintained a strong preference for the rights of the individual over coercive state action."). Appellant and his *amici* complain that the Superior Court, in this and other decisions, has not adhered to the ideals reflected in such decisions. *See, e.g.,* Brief for ACLU of Pa. at 15 n. 5 (attributing to the intermediate court "its own independent less stringent source doctrine").

Finally, Appellant regards the police conduct this case as most troublesome given the element of intrusiveness into the human body. *See Commonwealth v. Martin,* 534 Pa. 136, 142–43, 626 A.2d 556, 560 (1993) (explaining that, "although privacy may relate both to property and to one's person, an invasion of one's person is, in the usual case, [a] more severe intrusion on one's privacy interest than an invasion of one's property"). According to Appellant:

> What is at stake if the lower court's opinion is permitted to stand is an absolute abrogation of a citizen's expectation of privacy in his or her own person. Officers of this Commonwealth would be free to repeatedly extract blood from citizens, even though a prior search was found unconstitutional, correcting perceived defects in search warrants until a Constitutional level of probable cause has been demonstrated.

Brief for Appellant at 13.

The Commonwealth, for its part, does not contend that Detective Evans' investigation meets the *Melendez* requirement of "true independence." Rather, it advocates the application of a less exacting standard to circumstances that do not involve a knowing circumvention of a suspect's constitutional rights through intentional police misconduct.[9] The Commonwealth explains that this is, at least in substance, the approach taken by the Superior Court in a series of decisions involving

9. *Mason* involved an illegal police invasion into a private dwelling via the use of a battering ram. *See Mason,* 535 Pa. at 563–64, 637 A.2d at

illegal acquisitions of blood-related evidence, *see Commonwealth v. Ruey,* 854 A.2d 560 (Pa.Super.2004), *aff'd on other grounds* 586 Pa. 230, 892 A.2d 802 (2006) (plurality); *Smith,* 808 A.2d at 215; and *Commonwealth v. Lloyd,* 948 A.2d 875 (Pa.Super.2008), and suggested by two concurring Justices in *Ruey,* 586 Pa. at 256–59, 892 A.2d at 817–19 (Saylor, J., concurring, joined by Castille, C.J.). According to the Commonwealth, the appropriate standard in the absence of egregious police misconduct is the two-part inquiry set forth in *Murray,* namely, whether the decision to seek a warrant was prompted by something attained as a result of unlawful government conduct, and whether the approving magistrate had been informed of the improperly obtained information. *See Murray,* 487 U.S. at 542, 108 S.Ct. at 2536; *see also supra* notes 3 and 4; *accord Brundidge,* 533 Pa. at 175–76, 620 A.2d at 1119. While therefore refraining from use of the "truly independent" rubric, the Commonwealth regards Detective Evans' investigation as "sufficiently removed" from that of Detective Johnson to alleviate any taint. Brief for Appellee at 31. The Commonwealth concludes:

> [B]ecause the record in the instant matter establishes that there was sufficient probable cause beyond the appellant's DNA results upon which to seek a search warrant for appellant's blood, because the request for the second warrant was clearly not prompted by those results, because the magistrate did not issue the warrant based on those results, and because there was no police misconduct involved here, ... the DNA results obtained from a draw of the appellant's blood were admissible under the independent source doctrine in conformity with Article 1, Section [8] of the Pennsylvania Constitution.

*Id.* at 39.

We begin with the acknowledgement that, from an original-intent frame of reference relative to *Melendez,* the indepen-

253. *Melendez* strongly disapproved a police strategy of creating an "exigency" by arresting one person outside of a home, then using the arrest as an excuse to enter the premises illegally so as to prevent persons inside the home from destroying evidence upon learning of the arrest. *See Melendez,* 544 Pa. at 334–35, 676 A.2d at 231–32.

dent-investigative-team requirement appears to have been intended to extend to the broader category of unlawful searches and seizures, and the requirement of true independence was to have meant just that. The architect of the rule made this plain enough in his dissent in the recent, divided *Ruey* decision. *See Ruey,* 586 Pa. at 259–60, 892 A.2d at 819–20 (Cappy, C.J., dissenting) (opposing any departure from the requirement of true independence in a deficient affidavit scenario, even in the absence of overt police misconduct).

The sincere intentions underlying the innovation are clear enough. As amply related by Appellant and his *amici,* there was a heartfelt desire to vindicate the privacy interests of Pennsylvania citizens against unlawful government conduct. While there is a difference between egregious police misconduct and lesser infractions, such as carelessness, incompleteness, and/or oversight, the ideals underlying the independent approach to Article I, Section 8 jurisprudence—that privacy is to be guarded jealously against unlawful government intrusions and the probable-cause requirement is not to be diluted—extend to the wider range of incursions.

Since, however, the independent source doctrine lies outside the terms of the Pennsylvania Constitution, the embellishments of *Mason* and *Melendez* represented a form of prophylactic judicial lawmaking, as was candidly acknowledged in *Mason* in the following terms:

> It is axiomatic, of course, that once a judicially created rule is promulgated, the common law system requires that appellate courts consider this rule in its various factual guises and expand or contract the rule as justice requires.

*Mason,* 535 Pa. at 568, 637 A.2d at 255. This has, of course, left the courts free in subsequent cases to consider whether the broader pronouncements made there are as sensibly applied elsewhere, as new fact patterns are presented diverging from those before the Court in *Mason* and *Melendez.*

Notably, for better or for worse, the experience with broadly stated prophylactic rules often has been that they cannot be sustained on their original terms. A ready example is the

judicial rule that police were not to interrogate an arrestee for more than six hours after arrest unless the accused was brought before a neutral magistrate and arraigned, on pain of suppression of inculpatory statements attained in violation of the rule. *See Commonwealth v. Davenport*, 471 Pa. 278, 286, 370 A.2d 301, 306 (1977). In subsequent decisions, this rule became attenuated through pronounced limitations and exceptions, so that the force intended by the original proponents ultimately was lost. *See Commonwealth v. Perez*, 577 Pa. 360, 371–72 & n. 6, 845 A.2d 779, 785–86 & n. 6 (2004) (cataloguing and discussing various of the limitations and exceptions to the six-hour prompt-arraignment rule). For this reason, regardless of its salutary purposes, the bright-line six-hour prompt arraignment rule ultimately was discarded, *see id.*, and that abandonment was supported even by a Justice who would have preferred enforcement of the rule on its original terms. *See id.* at 381–82, 845 A.2d at 792 (Saylor, J., concurring and dissenting) (supporting the abrogation of the prompt-arraignment rule only in light of its effective evisceration over time).[10]

A similar weakening of the *Melendez* requirement of true independence can be seen in the present case. No one could seriously contend that Detective Johnson's and Evans' investigations were "truly independent" under a conventional understanding of those words, where the two conferred about the case and the latter worked directly from the case file previously maintained by the former.[11] Indeed, to its credit, the

10. Another example of an arena in which the Court has had great difficulty maintaining a stable independent state constitutional jurisprudence is the automobile search-and-seizure arena, as manifested by the divergent range of expressions of the Justices in *Commonwealth v. Perry*, 568 Pa. 499, 798 A.2d 697 (2002) (Opinion Announcing the Judgment of the Court).

11. The Commonwealth also never established with any certainty, one way or another, whether Detective Evans was aware of the incriminatory results of the DNA testing of the first blood sample obtained from Appellant. As Appellant and his *amici* argue, those results would have created a powerful incentive on the part of law enforcement to secure the second sample in the face of a deficient first warrant. Conversely, had the first sample excluded Appellant as a contributor relative to the crime-scene materials, it is difficult to conceive why the prosecution would pursue a second sample. Particularly given the incentives in-

Commonwealth does not so argue. Nevertheless, in the present case, the suppression court, believing *Melendez* applicable, implicitly diluted the true independence requirement by deeming it satisfied in spite of a collaborative transfer of a case file.

The greatest difficulty in the enforcement of a prophylactic rule intended to guard individual liberties is on account of the competing value in society's interest in identifying and punishing wrongdoers. Among other ways, this is manifested in the context of the independent source rule in the courts' reluctance to put police in a worse position than they were in prior to an irregularity. *See Brundidge*, 533 Pa. at 176–77, 620 A.2d at 1120. Furthermore, this tension between privacy and criminal justice enforcement has led to cost-benefit balancing in the search-and-seizure arena. *See, e.g., Leon*, 468 U.S. at 922, 104 S.Ct. at 3420 (explaining, for purposes of Fourth Amendment law, that "the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion"). While the execution of this approach has had strong detractors, *see, e.g.,* Wayne R. LaFave, 1 Search and Seizure, A Treatise on the Fourth Amendment § 1.3(b) (4th ed.2004), experience shows this type of assessment will occur in the courts despite the best efforts of those jurists who may oppose it, and it is our considered position that it is better that it be done in the open rather than occurring as unstated subtext.

█ In the present circumstances, we are unwilling to enforce a "true independence" rule in the absence of police misconduct and on pain of the Commonwealth being forever barred from obtaining non-evanescent evidence connecting Appellant with his crimes. In answer to the specific question presented, we hold that suppression is not required on account of Detective Evans' status as a member of the same police

volved, and in the absence of any specific testimony on the point, on this record it is very difficult to credit the suppression court's finding that the Commonwealth proved the absence of any causal nexus between the results of the first test and Detective Evans' affidavit of probable cause.

department as Detective Johnson. Rather, in light of the factual circumstances before the Court in both *Melendez* and *Mason*, we deem it appropriate to limit the independent police team requirement to situations in which the rule prevents police from exploiting the fruits of their own willful misconduct.[12] Where such malfeasance is not present, we agree with the Superior Court that the *Murray* standard strikes the appropriate balance between privacy and law enforcement. *See Lloyd*, 948 A.2d at 881–82. Ultimately, we believe the "twin aims" of Article I, Section 8—namely, the safeguarding of privacy and enforcement of the probable-cause requirement—may be vindicated best, and most stably, by taking a more conservative approach to the departure this Court has taken from the established Fourth Amendment jurisprudence.

Finally, we acknowledge the intrusiveness involved in the performance of a second blood draw occasioned by a defective first warrant. We note only that the need for the serial sample is also an unintended consequence of a previous departure from Fourth Amendment law, under which suppression would not have been required of results of the first DNA test. *See Leon*, 468 U.S. at 926, 104 S.Ct. at 3422 ("In the absence of an allegation that the magistrate abandoned his detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause.").

The order of the Superior Court is affirmed.

12. *See Mason*, 535 Pa. at 571–72, 637 A.2d at 257 ("[W]here police seize evidence in the absence of a warrant or exigent circumstances by forcibly entering a dwelling place, their act constitutes a violation of Article I, Section 8 of the Pennsylvania Constitution and items seized pursuant to their illegal conduct may not be introduced into evidence[.]"); *Melendez*, 544 Pa. at 334–35, 676 A.2d at 231 ("The Pennsylvania Constitution does not allow police intrusions exemplified by this case and *Mason*. Government agents may not enter private dwellings through the use of battering rams as in *Mason*, or by effecting illegal stops and seizures as in this case, and secure the premises by detaining those who occupy the premises while police wait to learn whether their application for a warrant has been approved.").

Justice ORIE MELVIN did not participate in the consideration or decision of this case.

Chief Justice CASTILLE and Justices EAKIN and McCAFFERY join the opinion.

Chief Justice CASTILLE files a concurring opinion.

Justice TODD files a concurring opinion in which Justice BAER joins.

Chief Justice CASTILLE, concurring.

I join the learned Majority Opinion in its entirety. Where, as here, police act pursuant to a warrant and engage in no misconduct, the broad state constitutional *dictum* articulated in *Commonwealth v. Melendez,* 544 Pa. 323, 676 A.2d 226 (1996)—purporting to require in all independent source cases that, among other things, the police team involved in the second search must be "truly independent" of the first— simply cannot be sustained. The operative facts here are very different from the circumstances actually at issue in *Commonwealth v. Mason,* 535 Pa. 560, 637 A.2d 251 (1993) and *Melendez;* and I fully agree with the Majority that, "[w]here [ ] malfeasance is not present, ... the *Murray* [*v. United States,* 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988) ] standard strikes the appropriate balance between privacy and law enforcement." Majority op. at 290, 47 A.3d at 805 (footnote omitted).

Mr. Justice Saylor's restrained, candid and modest attempt to fashion state constitutional jurisprudence along principled lines ameliorates the lack of restraint in the *Melendez* Court's fashioning a quasi-legislative rule that would govern cases and circumstances not then before us. I, for one, would be inclined to go farther and reexamine *Melendez* itself, since it was unsupported by a principled state constitutional analysis. *See Commonwealth v. Russo,* 594 Pa. 119, 934 A.2d 1199, 1209 n. 11 (2007) ("We reiterate that we believe that state constitutional decisions are more secure when they are supported by the searching inquiry contemplated by [*Commonwealth v.*

*Edmunds*, 526 Pa. 374, 586 A.2d 887 (1991) ].").[1] However, that analysis can await a case where the issue is squarely presented.

In any event, I write separately primarily to respond to Madame Justice Todd's Concurring Opinion. Justice Todd supports a reaffirmation and extension of the *Melendez* rule as stated to embrace factual circumstances such as those in the case *sub judice*, *i.e.*, cases, unlike *Mason* and *Melendez*, where there was no police misconduct.[2] I have no doubt that my

1.  I have previously addressed this elemental point as follows:

    I am particularly wary of novel expansions of Article I, § 8 that are unaccompanied by an *Edmunds* analysis. A novel and unexplained holding under Article I, § 8 is a practice that permits a jurisprudence of contrariness or, even worse, arbitrariness. Such an unexplained holding is at least as likely to be a mere expression of a Court majority's personal disagreement with contrary Fourth Amendment jurisprudence, dressed in state constitutional garb in order to avoid correction by the United States Supreme Court, as it is to be an affirmative expression of what the state provision uniquely means and embraces. By previously requiring that novel state constitutional claims be considered in light of our actual experience with Article I, § 8 and with the experience of this Court and other courts with similar search and seizure questions, and with policy concerns "unique" to our jurisprudence, the *Edmunds* construct at least provides some semblance of a principled constitutional analysis of a particular issue. The inability to even begin to defend a novel holding pursuant to *Edmunds*, on the other hand, betrays a total disregard for the experience of other courts as well as for this Court's own considered experience and, in my view, raises a presumption that the state constitutional holding is erroneous.

    *Commonwealth v. Shaw*, 564 Pa. 617, 770 A.2d 295, 304–05 (2001) (Castille, J., joined by Saylor, J., dissenting).

2.  Justice Todd notes that the independent source doctrine has been described by some as an "exception" to the exclusionary rule. *See* Todd, J., concurring op. at 300 n. 4, 303–04, 47 A.3d at 811 n. 4, 813–14. Notably, the U.S. Supreme Court's decision in *Murray v. United States*, 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988) never referred to the independent source doctrine as an "exception" to the exclusionary rule: the Court spoke of the "doctrine," which arose contemporaneously with the exclusionary rule, and which required an analysis of attenuation and taint. It was the *Murray* dissenting opinion that characterized the doctrine as an "exception," and then advocated for an expansive *per se* rule.

    Bearing silent fidelity to the dissenting view in *Murray*, both the *Mason* concurrence and the *Melendez* majority spoke of the independent source doctrine as an "exception" to the exclusionary rule. But, such an argumentative label puts the proverbial rabbit in the hat. The

esteemed colleague's views in this regard are as sincere and heartfelt, Majority op. at 286–87, 47 A.3d at 803, as those of the Justices who innovated the broad *Melendez* rule. However, in expressing the view, Justice Todd levels what I believe are unwarranted, and indeed ironic, criticisms of the Majority Opinion.

Justice Saylor has very carefully accounted for the original intentions of the *Melendez* Court; the sincerity of those intentions; the nature of the constitutional rule there innovated (non-textual and prophylactic); the inherent difficulty with practical application of broadly stated prophylactic rules; the mischief that arises when courts try to force new facts to fit problematically-broad pronouncements, as occurred in the trial court here (and as is mirrored in Justice Todd's concurrence); and the fact that any serious constitutional analysis must account for society's interest in identifying and punishing wrongdoers as well as the value (protection of individual liberties) served by the prophylactic pronouncement that was the concern of the *Melendez* Court. The Majority could be far less kind to *Mason* and *Melendez*. The Majority could focus on: the absence of an *Edmunds* analysis in either case, indeed the absence of any authority but the apparent policy preferences of court majorities; the importance of judicial restraint before constitutionalizing evanescent preferences; and the fact that, to the extent *Melendez* purported to speak to circumstances not involving police misconduct, its prophylactic rule was, by definition, *obiter dicta*.

For its careful effort, the Majority Opinion is met with a concurrence accusing the Court of "choosing" to "radically" constrict the *Melendez* "rule," and of "truncating" the rule, as envisioned by *Melendez*, "in a sweeping and prospective fash-

independent source doctrine does not involve an exclusionary rule "exception," such as the good faith exception, but a question of taint from prior illegality, which implicates principles of independence and attenuation. It is not an "exception" to the exclusionary rule to admit untainted evidence; no rational application of an exclusionary rule would exclude untainted evidence. Indeed, viewed more fundamentally, it is the exclusionary rule that is a policy-based "exception" to bedrock rules of evidence. The independent source cases involve situations where the exclusionary rule "exception" does not apply, and rules of relevance pertain.

ion." Todd, J., concurring at 298, 47 A.3d at 809–10. The irony in the accusations is striking, given the nature of the decision in *Melendez.*

The "truly independent police or investigative team" requirement at issue was proposed in the Concurring Opinion of Mr. Justice (later Chief Justice) Cappy in *Mason,* and his position was then "adopted" by a majority of the *Melendez* Court. Without any explanation, *Melendez* then applied this new rule retroactively to condemn police conduct that had occurred before the preference was constitutionalized. *Melendez,* 676 A.2d at 231. But, that was less than half the harm of *Melendez* because its rule, as fashioned, and as defended by the concurrence here, purported to establish an independent police team requirement in all independent source cases. It was, as Justice Saylor notes, articulated as a prophylactic rule—albeit the *Melendez* Court did not admit as much, nor did the Court try to explain or justify such a radically broad pronouncement.

And so, in addition to being applied retroactively to condemn the police in *Melendez,* the *Melendez* rule "was sweeping and prospective," purporting to decide cases not then before the Court—like this one. In this respect, the independent-police-team-in-all-independent-source-cases innovation was unnecessary to the decision, improperly legislative in scope, and as overbroad and ill-informed (in that it did not perceive or discuss the circumstance here) as it was constitutionally unmoored. Whether one agrees with *Melendez* or not, it was a radical decision, which chose to remake existing constitutional law, chose to severely constrict the police and to condemn police conduct retroactively, and chose to attempt to govern future circumstances not then before the Court, as if the Court were a super-legislature. With apologies to the Bard, at least as against the concurrence's accusations here, Justice Saylor's modest and restrained Majority Opinion is, when compared to *Melendez,* as "Hyperion to a satyr." Shakespeare, William, *Hamlet* (I.ii.140).

Justice Todd's Concurring Opinion also claims that the Majority's "limitation" on *Melendez* is "wholly ill-advised and

unwarranted." Todd, J., concurring op. at 296, 47 A.3d at 809. Notably, what was warranted here, at all times, was the conduct of the police. Judicial officers approved the warrants. The concurrence maintains that the "purpose of the *Mason/Melendez* rule of strict independence of investigative teams, was . . . to ensure that, if such evidence is to be used by a court of this Commonwealth in a criminal trial, it has been thoroughly purged of the taint of the original violation of the rights secured by Article I, Section 8." Todd, J., concurring op. at 304, 47 A.3d at 813–14. To be clear, the "original violation," as noted in Justice Todd's concurring opinion, was not a police violation and there was no police misconduct here. A judicial officer erred, as judicial officers occasionally do, in assessing probable cause for the first warrant. That judicial error did not operate to taint the police "investigative team." As the U.S. Supreme Court has recently noted:

> It is one thing for the criminal "to go free because the constable has blundered." *People v. Defore,* 242 N.Y. 13, 21, 150 N.E. 585, 587 (1926) (Cardozo, J.). It is quite another to set the criminal free because the constable has scrupulously adhered to governing law. Excluding evidence in such cases deters no police misconduct and imposes substantial social costs.

*Davis v. United States,* —— U.S. ——, ——, 131 S.Ct. 2419, 2434, 180 L.Ed.2d 285 (2011).[3]

**3.** In its "purging taint" discussion, the concurrence cites to Justice Marshall's dissenting opinion in *Murray* as support for an independent police team requirement. Todd, J., concurring op. at 302–04, 47 A.3d at 813–14. Notably, however, that position was expressed by Justice Marshall in terms of the Fourth Amendment's deterrence rationale. Indeed, in the sentence immediately preceding the quotation upon which Justice Todd relies, Justice Marshall argued that: "The strong Fourth Amendment interest in eliminating these incentives for illegal entry should cause this Court to scrutinize closely the application of the independent source exception to evidence obtained under the circumstances of the instant cases; respect for the constitutional guarantee requires a rule that does not undermine the deterrence function of the exclusionary rule." *Murray,* 487 U.S. at 548, 108 S.Ct. 2529 (Marshall, J., dissenting).

Although the independent police team requirement articulated by Justice Cappy in *Mason* obviously derives from Justice Marshall's *Murray* dissent, Justice Cappy notably did not cite that dissent, perhaps recognizing that Justice Marshall's deterrence focus would undermine any

If the Magisterial District Judge had declined to issue the first search warrant here, the same police or investigative team would have been free to make use of what information it had, and then to simply refine the affidavit, or gather more evidence, and re-apply for a warrant.[4]  In a system of separated powers, by what logic can a court assume the constitutional power to coerce the executive into adopting specific police investigative policies merely because a judicial officer has made a legal error?  I understand the temptation to employ the exclusionary rule to "punish" or deter acts of police excess.  But, it is quite another exercise to pointlessly punish the executive—and victims of brutal crimes—for a judicial mistake.  Nothing in Article I, Section 8 authorizes this sort of judicial micromanagement of police investigations.

The Majority notes that the Commonwealth does not argue that the second investigation and warrant here were "truly independent" of the first one, and reasons that no one could seriously contend otherwise "under a conventional understanding of those words."  Majority op. at 285, 288, 47 A.3d at 802, 804.  I agree;  thus, if the *Melendez dicta* were binding, reversal would be required.  But, *Melendez* is not binding and cannot be.  This is a case involving a brutal abduction and rape;  two warrants issued by judicial officers, the second of which unquestionably was premised upon probable cause;  and the seizure of blood (no knocking down doors);  and no police misconduct.  The notion that such a crime should be rendered non-prosecutable because the *Melendez* Court, not facing such facts, purported to constitutionalize a minority position from the U.S. Supreme Court concerning the Fourth Amendment which would require an independent police investigative team, as if it were a Pennsylvania state constitutional command, in all cases, without benefit of relevant argumentation or state constitutional analysis, is absurd.  Nothing in the Pennsylva-

claim that the rule he was proposing was unique to the Pennsylvania experience under Article I, Section 8.

4.  Clearly, this alternate fact pattern should be read in the context of the entire paragraph.

nia constitutional tradition, which did not even recognize an exclusionary rule, requires this.

The judicially-fashioned exclusionary rule requires police to answer for their actual mistakes; the Majority Opinion here takes responsibility for an obvious judicial mistake in *Melendez* and mitigates the harm. I join the corrective effort.

Justice TODD, concurring.

I concur in the result reached by the majority, as I agree that the results of testing performed on the second sample of blood taken from Appellant's body were, as the suppression court found, admissible. However, I cannot endorse the majority's rationale in arriving at this result. The majority acknowledges that, in order for evidence to be admissible at a criminal trial under Article I, Section 8 of the Pennsylvania Constitution, the rule articulated by our Court in *Commonwealth v. Mason*, 535 Pa. 560, 637 A.2d 251 (1993), and *Commonwealth v. Melendez*, 544 Pa. 323, 676 A.2d 226 (1996) (hereinafter, the *Mason/Melendez* rule), was intended to require an independent investigative team in **all** instances where police conduct an unlawful search and seizure prior to seizing the evidence through lawful means.[1] Nevertheless, despite that recognition, the majority now chooses to radically constrict the applicable scope of that rule to only those limited instances in which police engage in the specific egregious police misconduct which was exhibited in those cases—namely, battering down the door of an apartment with a battering ram without probable cause (*Mason*), or unlawfully seizing the owner of a house and using her key to gain entry to her house (*Melendez*). I believe such a limitation to be wholly ill-advised and unwarranted.[2]

1. *See* Majority Opinion at 286–87, 47 A.3d at 803 ("We begin with the acknowledgment that, from an original-intent frame of reference relative to *Melendez*, the independent-investigative-team requirement appears to have been intended to extend to the broader category of unlawful searches and seizures, and the requirement of true independence was to have meant just that.").

2. While I respectfully differ with the majority's decision to abrogate our Court's prior *Melendez* decision, I note that it is written with the usual

The overarching concern for protecting the fundamental individual rights secured by Article I, Section 8,[3] which was the impetus for our Court's "independent source" requirement, *see Melendez*, 544 Pa. at 334, 676 A.2d at 231, is not diminished in the factual context of the instant case; nor would application of this requirement operate in the present case to "forever" bar the Commonwealth "from obtaining non-evanescent evidence connecting Appellant with his crimes" as the majority suggests. Majority Opinion at 288-90, 47 A.3d at 804-05. Nonetheless, the majority has truncated the *Mason/Melendez* rule in a sweeping and prospective fashion so that it will henceforth apply only to those narrow subset of cases in which police conduct amounts to "willful misconduct" or "malfeasance." In so doing, our Court has needlessly, and in my view, unwisely, diminished the protections of the citizenry of this Commonwealth which Article I, Section 8 affords. Thus, I write separately to distance myself from the majority's curtailment of this rule, particularly as the facts of this case present no compelling reason for doing so.

In adopting a standard for the application of the independent source doctrine under Article 1, Section 8 for all cases in which police "malfeasance is not present," Majority Opinion at 290, 47 A.3d at 805, the majority supplants the *Mason/Melendez* rule with that set forth by the United States Supreme Court in *Murray v. United States*, 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988). However, such an all-encompassing embrace disregards our Court's clear recognition in

erudition and thoughtfulness that is the hallmark of its author. As I explain herein, my difference with the majority's present decision to veer from the clear jurisprudential course illuminated by our Court in our prior *Melendez* decision is founded on a principled disagreement with the majority as to how the values embodied in Article One, Section 8 of our Constitution may best be served by courts in circumstances such as those presented by the case at bar.

3. This Pennsylvania constitutional provision guarantees:

The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant. Pa. Const. art. I, § 8.

*Mason* and *Melendez* that the federal *Murray* standard is insufficiently protective of the rights of the people of this Commonwealth which are secured by Article 1, Section 8.

The proscription against unlawful searches and seizures, contained in Article 1, Section 8, is one of the foundational protections of individual human rights provided by the framers of our state Constitution, and is "meant to embody a strong notion of privacy, carefully safeguarded in this Commonwealth for the past two centuries." *Commonwealth v. Edmunds*, 526 Pa. 374, 394, 586 A.2d 887, 897 (1991). This prohibition against governmental trammeling of the right of individual privacy through unlawful intrusion was the driving force behind the inclusion of the prohibition against unlawful searches and seizures in our original Constitution in 1776, a full 15 years before the Fourth Amendment was ratified, and it remains enshrined, virtually unchanged, in our present charter of governance. *See Commonwealth v. Sell*, 504 Pa. 46, 65, 470 A.2d 457, 467 (1983) ("[T]he survival of the language now employed in Article I, Section 8 through over 200 years of profound change in other areas demonstrates that the paramount concern for privacy first adopted as part of our organic law in 1776 continues to enjoy the mandate of the people of this Commonwealth."). The historical motivation of the drafters of our original Constitution, led by Benjamin Franklin in 1776, was to protect the right of individual privacy from unlawful governmental intrusion through the insistence that no search or seizure of a person via warrant take place unless that warrant was supported by probable cause:

> The primary purpose of the warrant requirement was to abolish 'general warrants,' which had been used by the British to conduct sweeping searches of residences and businesses, based upon generalized suspicions. Therefore, at the time the Pennsylvania Constitution was drafted in 1776, the issue of searches and seizures unsupported by probable cause was of utmost concern to the constitutional draftsmen.

*Edmunds*, 526 Pa. at 394, 586 A.2d at 897 (citation omitted). Thus, to bolster this aim of Article 1, Section 8—the safe-

guarding of individual privacy and ensuring that warrants will be issued only on probable cause—it is a bedrock principle of our law that any evidence obtained through a search with a warrant which was issued without probable cause will be excluded from use by a court of this Commonwealth in a criminal trial.

By contrast, the United States Supreme Court has embraced a different rationale for excluding evidence seized in violation of the individual privacy rights secured by the Fourth Amendment to the United States Constitution, which does not require the exclusion of such evidence in order "to redress the injury to the privacy of the search victim." *U.S. v. Calandra,* 414 U.S. 338, 347, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). Rather, the high Court considers the primary purpose for excluding such evidence to be deterrence of future police violations of the Fourth Amendment. *Arizona v. Evans,* 514 U.S. 1, 10, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995). Thus, in *Murray,* the high Court's elucidation of the parameters required by the Fourth Amendment for the application of the independent source doctrine [4] was in furtherance of this objective of prospective deterrence of police misconduct. The high

---

**4.** The concurring opinion by Chief Justice Castille posits that this characterization of the independent source doctrine as an "exception" to the exclusionary rule is somehow erroneous. Concurring Opinion (Castille, C.J.) at 291–92 n. 2, 47 A.3d at 806–07 n. 2. I respectfully disagree. In a situation where evidence tainted by an illegal search is otherwise obtained by the police through a genuinely independent source, without violation of individual constitutional rights, the exclusionary rule will not operate to bar introduction of the evidence at a subsequent criminal trial; thus, in this sense, it is an exception to the application of the exclusionary rule. This characterization of the independent source doctrine as an exception to the exclusionary rule is hardly an aberration as it has been frequently utilized by other courts and recognized by scholarly commentators. *See, e.g., U.S. v. Runyan,* 290 F.3d 223, 235 (5th Cir.2002); *U.S. v. Heckenkamp,* 482 F.2d 114, 1149 (9th Cir.2007); *State v. Rabon,* 930 A.2d 268, 275 (Me.2007); *State v. Gaines,* 154 Wash.2d 711, 116 P.3d 993, 996 (2005); William E. Ringel, *Searches and Seizures and Arrests and Confessions,* § 3:8 (2009); John E. Theuman, *State Constitutional Requirements as to Exclusion of Evidence Unlawfully Seized—post–Leon Cases,* 19 A.L.R.5th 470 (2011). Whatever the concurrence posits as the proper characterization, it remains the case that the independent source doctrine simply has no application absent the specter that challenged evidence might otherwise be inadmissible under the exclusionary rule.

Court utilized a "cost-benefit" approach, which the majority seemingly has adopted today, in explaining that the doctrine's application should be governed by the balancing of the interest in deterring unlawful police conduct against the interest in receiving probative evidence at a criminal trial:

The interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse, position tha[n] they would have been in if no police error or misconduct had occurred. When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation.

*Murray,* 487 U.S. at 537, 108 S.Ct. 2529 (emphasis omitted) (quoting *Nix v. Williams,* 467 U.S. 431, 443, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984)). The Court ultimately considered the objective of deterrence to be adequately served by allowing evidence which had previously been illegally seized by police to be admitted into evidence, so long as the subsequent acquisition of such evidence was "genuinely independent" of a preceding tainted seizure. *Murray,* 487 U.S. at 542, 108 S.Ct. 2529. In this regard, *Murray* delineated two factors which would defeat a finding of independence: (1) the decision of the police to request the second search warrant was prompted by what was seen during the initial unlawful search, or (2) evidence or information obtained in the original search was presented to the magistrate in the application for the second warrant and thereby affected his decision to issue the second warrant. *Id.*

We utilized the *Murray* test in *Commonwealth v. Brundidge,* 533 Pa. 167, 620 A.2d 1115 (1993); however, such utilization was proper in that case, as our Court was considering only the question of the applicability of the independent source doctrine under the Fourth Amendment to the United States Constitution. Later that same year, though, in *Commonwealth v. Mason,* 535 Pa. 560, 637 A.2d 251 (1993), our Court considered whether the *Murray* test governed the

application of the independent source doctrine under Article I, Section 8 of the Pennsylvania Constitution. Specifically, we considered whether the doctrine permitted the use of evidence seized from the defendant's apartment after members of a police undercover drug investigative unit, who were awaiting the arrival of a search warrant which one of their team members had gone to a magistrate to obtain, decided to break down the apartment door with a battering ram and search it. Our Court concluded such a warrantless intrusion and seizure of evidence, absent probable cause and exigent circumstances, violated Article I, Section 8, and the evidence discovered in the unlawful search could not be admitted pursuant to the independent source doctrine simply because a warrant was, in fact, later issued authorizing a search of the apartment.

In arriving at this conclusion, our Court recognized that if it were to decide the case based on Fourth Amendment law as articulated by *Murray,* suppression of the evidence would not be required. However, mindful that the protections of Article 1, Section 8 are applied not merely for the purpose of deterring police misconduct, but "also to safeguard privacy and the requirement that warrants shall be issued only upon probable cause," *Mason,* 535 Pa. at 571, 637 A.2d at 256, we declined to follow the *Murray* test.

Former Chief Justice, then Justice, Cappy authored a joining concurrence in which he lauded the majority's approach as "reining in" what he viewed, in the wake of *Brundidge,* as a potential "unfettered stampede" to use the independent source doctrine to contravene the clear purposes of Article I, Section 8 and our exclusionary rule. *Id.* at 572, 637 A.2d at 257. From Justice Cappy's perspective, the source of the information for the issuance of the warrant in *Brundidge* was not truly independent. *Id.* at 572 n. 1, 637 A.2d at 257 n. 1.

Justice Cappy expressed his belief that the independent source doctrine should be applied only in very narrow and limited circumstances, "where the 'independent source' is **truly independent from both the tainted evidence and the police or investigative team which engaged in the misconduct by which the tainted evidence was discovered.**" *Id.* at

573, 637 A.2d at 257–58 (emphasis original). He voiced his overarching concern that "the 'independent source doctrine,' as an exception to the exclusionary rule, should not be allowed to swallow the rule itself." *Id.* In his view,

> [T]he application of the "independent source doctrine" in a situation where the 'independent source' is not truly independent of both the tainted evidence itself and the officers involved in the initial illegal search will completely eviscerate the exclusionary rule, failing either to deter police misconduct or to protect individual privacy rights as required by Article I, Section 8 of the Pennsylvania Constitution.

*Id.* at 574, 637 A.2d at 258.

It was this same concern for protecting the privacy interests of individuals in their persons and their homes that led this Court in *Melendez* to adopt Justice Cappy's suggested restriction on the use of the independent source doctrine under Article I, Section 8 to only those situations where the source "is truly independent." *Melendez,* 544 Pa. at 334, 676 A.2d at 231 (quoting *Mason,* 535 Pa. at 573, 637 A.2d at 258).[5] As the

---

**5.** Although in his concurrence the Chief Justice highlights the fact that the *Mason* and *Melendez* Courts did not conduct a formal four-part "*Edmunds* analysis," Concurring Opinion, (Castille, C.J.) at 292, 47 A.3d at 807, the absence of this analysis does not, in my view, undermine the precedential strength of those cases or diminish the strength of the state constitutional analysis contained therein. In *Edmunds* itself we imposed no requirement on courts to follow that particular analytical framework in addressing questions regarding the scope and application of Article I, Section 8; rather we found it important (though not mandatory) that **litigants** brief these factors in cases implicating the Pennsylvania Constitution. *See Edmunds,* 526 Pa. at 390, 586 A.2d at 895 ("[W]e find it important to set forth certain factors to be briefed and analyzed by litigants in each case hereafter implicating a provision of the Pennsylvania constitution.") Indeed, a mere five months prior to the *Melendez* decision our Court stated: *"Edmunds* expresses the idea that it may be helpful to address the concerns listed therein, not that these concerns must be addressed in order for a claim asserted under the Pennsylvania Constitution to be cognizable." *Commonwealth v. White,* 543 Pa. 45, 50, 669 A.2d 896, 899 (1995); *see also Commonwealth v. Shaw,* 564 Pa. 617, 622 n. 2, 770 A.2d 295, 298 n. 2 (2001) (*"Edmunds* imposes no . . . requirement [to conduct "an *Edmunds* analysis"] on **this Court,** but instead, sets forth the briefing requirements for **litigants** seeking this Court's review of claims based exclusively on the Pennsylvania Constitution." (emphasis original)). Fur-

majority herein recognizes, this restriction was intended to apply in all instances where the evidence in question previously was obtained via an illegal search and seizure. This was wholly consonant with our Court's emphasis that it is irrelevant for purposes of Article I, Section 8 whether an illegal seizure of evidence is the result of blatant police misconduct or was merely the product of inadvertent reliance on a warrant lacking probable cause, since Article I, Section 8's emphasis on protecting individual privacy prohibits the introduction of evidence at trial which is obtained through either type of conduct with equal force.[6] *Edmunds, supra.* The purpose of the

ther, in *Mason* and *Melendez,* we expressly considered the unique history and fundamental purposes of Article I, Section 8 in choosing not to follow the United States Supreme Court in its interpretation of the Fourth Amendment to the United States Constitution.

6. I do not suggest that the police committed any misconduct in executing the first search warrant in this case after the magistrate issued it; however, it is not disputed that this warrant lacked the constitutionally-mandated probable cause required for its issuance, and it was, therefore, invalid. Thus, the forcible taking of blood from the body of Appellant pursuant to this invalid warrant was illegal. *See, e.g., Commonwealth v. Dobbins,* 594 Pa. 71, 934 A.2d 1170 (2007) (holding that since sheriffs had no statutory authorization to seek search warrant, resulting search was illegal); *Edmunds* (recognizing that searches conducted pursuant to a warrant issued without probable cause or which is otherwise fundamentally defective are illegal); *Commonwealth v. White,* 459 Pa. 84, 88, 327 A.2d 40, 42 (1974) ("Since the search warrant was defective and there was no voluntary consent to the search, the trial court did not err in its conclusion that this was an illegal search and seizure."). It was this illegal seizure of evidence in violation of the basic rights secured by Article I, Section 8 which irrevocably tainted the evidence acquired under the first warrant and necessitated that it be excluded from use in a judicial proceeding in this Commonwealth. *See Edmunds,* 526 Pa. at 395–397, 586 A.2d at 897–899 (emphasizing the consistent objective of the exclusionary rule in Pennsylvania to exclude evidence obtained in violation of Article I, Section 8 is to "bolster the twin aims of Article I, Section 8[:] . . . the safeguarding of privacy and the fundamental requirement that warrants shall only be issued upon probable cause.").

Moreover, and respectfully, the situation present in the case at bar is not, as suggested by the Chief Justice in his concurrence, *see* Concurring Opinion (Castille, C.J.) at 295–96, 47 A.3d at 808–09, analogous to one in which a police officer applies for a warrant and the warrant application is denied by a magistrate for lack of probable cause, but the officer gathers additional information to augment the warrant application, reapplies for a search warrant, and a warrant supported by probable cause is then issued by the magistrate. In that circumstance,

*Mason/Melendez* rule of strict independence of investigative teams, was, therefore, to ensure that, if such evidence is to be used by a court of this Commonwealth in a criminal trial, it has been thoroughly purged of the taint of the original violation of the rights secured by Article I, Section 8. *See Commonwealth v. Melilli,* 521 Pa. 405, 421, 555 A.2d 1254, 1262 (1989) ("If the prosecution can demonstrate that the allegedly tainted evidence was procured from an independent origin—a means other than the tainted sources—the evidence will be admissible.")

The majority's present restriction of this requirement to only the rare situations where the police have engaged in the most blatant type of misconduct significantly weakens this safeguard, since, as Justice Marshall has aptly observed:

When ... the same team of investigators is involved in both the first and second search, there is a significant danger that the "independence" of the source will in fact be illusory, and that the initial search will have affected the decision to obtain a warrant notwithstanding the officers' subsequent assertions to the contrary. It is therefore crucial that the factual premise of the exception—complete independence— be clearly established before the exception can justify admission of the evidence.

*Murray,* 487 U.S. at 548–549, 108 S.Ct. 2529 (Marshall, J., dissenting).[7]

the police officer conducted no illegal search and obtained no evidence unlawfully but rather conducted the search only after probable cause existed for the issuance of a valid search warrant; hence the seizure of the evidence pursuant to that warrant is untainted by any prior constitutional violation and unquestionably lawful.

7. In his concurrence, the Chief Justice postulates that the logic embodied in Justice Marshall's dissent in *Murray* must be understood as founded on an exclusionary rule, the application of which is focused solely on deterring police misconduct—and, thus, should be read only in that context. *See* Concurring Opinion (Castille, C.J.) at 295 n. 3, 47 A.3d at 808 n. 3. I do not so narrowly cabin the quoted wisdom of that eminently learned jurist. Inasmuch as the fundamental truth of Justice Marshall's observation is rooted in a common sense understanding of the influence of human observations on behavior, as the late Chief Justice Cappy recognized in *Mason* and *Melendez,* the requirement of strict independence of investigative teams from officers who conducted

Consequently, in my view, whenever evidence is seized pursuant to an initial illegal search undertaken as the result of a search warrant issued without probable cause, and the Commonwealth later seizes that same evidence pursuant to a subsequent valid search warrant, the *Mason/Melendez* rule should be applied to guarantee that the admission of such evidence is wholly free of the taint of the original Article I, Section 8 violation. Thus, evidence obtained pursuant to a subsequent search warrant, based on constitutionally sufficient probable cause, should be deemed to have originated from an independent source only if: (1) the tainted evidence obtained from execution of the prior illegal warrant is not relied upon in the pursuit of the subsequent warrant, and (2) the affiant or affiants seeking the subsequent warrant are truly independent of the police officers or the investigative team [8] which participated in the previous illegal search and seizure.

Although the majority posits it is presently necessary to abandon the *Mason/Melendez* rule because, in its estimation, enforcement in this case would potentially result in "the Commonwealth being forever barred from obtaining non-evanescent evidence connecting Appellant with his crimes," Majority Opinion at 289, 47 A.3d at 804–05, the record does not support this conclusion. As the majority recites, the trial court, applying the *Mason/Melendez* rule, found the evidence obtained pursuant to the second warrant to be admissible under the independent source doctrine as it was "independent

a prior illegal search and seizure is vitally necessary to vindicate the protections of Article I, Section 8, as it is the only sure means of ensuring that the decision to seek any subsequent warrant is truly independent from, and, thus, not infected by, the evidence obtained as the result of the violation of that constitutional provision.

**8.** This latter requirement was never intended, as Appellant suggests, to necessitate barring an **entire** police department from conducting a subsequent independent investigation after a previous illegal search or seizure by some officers in that department; rather, it was intended to bar only those specific officers who participated in that search or seizure. *See Mason*, 535 Pa. at 574, 637 A.2d at 258, (Cappy, J., concurring) (specifying that independent source doctrine applies only when the source of the evidence is "independent of both the tainted evidence itself and **the officers** involved in the initial illegal search" (emphasis added)).

from the tainted evidence and the investigative team" who obtained the first warrant. *Trial Court Opinion*, 6/20/06, at 5 (citing *Melendez*). I believe the evidence adduced at the suppression hearing, when viewed in a light most favorable to the Commonwealth as the prevailing party, supports the trial court's finding in this regard.[9]

Regarding the first prong of the application of the *Mason/Melendez* rule, which requires that the tainted evidence play no role in the investigative process which leads to the obtaining of the second search warrant, I discern nothing from the record to indicate that Appellant's DNA test results obtained by the execution of the first warrant, in which Detective Evans did not participate, contaminated the investigative process which led to the issuance of the second warrant. As acknowledged by the majority, the record does not establish that Detective Evans had any awareness of those test results, and neither the results themselves, nor any derivative evidence therefrom, was utilized by Detective Evans in his investigation, nor in his affidavit of probable cause presented to the magistrate for the issuance of the second warrant. Thus, the tainted evidence procured by the first warrant did not infect the magistrate's decision to issue the second warrant.

With respect to the second prong of the *Mason/Melendez* rule, that the independent source be truly independent from the police officers or investigative team who engaged in the illegal search, the record evidence, when viewed most favorably to the Commonwealth, supports the trial court's conclusion that Detective Evans was not a member of the group of officers who initially investigated the victim's assault, or that he played any other part in the investigation which led to the

9. When we review a suppression ruling adverse to the defendant, we consider only the evidence presented by the Commonwealth, and the evidence of the defense which is uncontradicted when fairly read within the context of the entire record. *Commonwealth v. Pruitt*, 597 Pa. 307, 325, 951 A.2d 307, 317 (2008). Our task in reviewing the factual findings of the suppression court is to determine if they are supported by the record, and, if we establish that they are, we are bound by them. *Commonwealth v. Jones*, 605 Pa. 188, 198, 988 A.2d 649, 654 (2010).

obtaining of the first search warrant. Indeed, at the time the first investigation was taking place, Detective Evans was doing "pre-employment polygraphs" for the Pittsburgh Police Department. N.T. Suppression Hearing, 5/22/06, at 53.

Additionally, and critically, there was no evidence of record suggesting that, as Detective Evans conducted his own investigation, Detective Johnson, or any other member of the original investigative team, supervised, coordinated, or collaborated with Detective Evans on the conduct of his investigation in any way. According to the testimony adduced under oath at the suppression hearing, Detective Evans' sole contact with Detective Johnson regarding the investigation occurred when Detective Evans met with Assistant District Attorney Janet Necessary and Detective Johnson, and was told at that time to research and develop probable cause for a search warrant for Appellant's blood. Detective Evans attested, under oath, that he did not review the first search warrant with Detective Johnson, nor was he informed of any problems with that warrant. *Id.* at 55–56, 58–59.

Although Detective Evans' investigation quite naturally covered some of the same ground as Detective Johnson's, the record supports the conclusion that he did not simply robotically reenact Detective Johnson's efforts.[10] Detective Evans testified that he did not rely solely on the information in the case file in the conduct of his investigation, but, rather, conducted his own independent investigation, which included: reviewing a number of reports in the file in addition to Detective Johnson's report; reading the victim's medical records, which provided the additional information the victim had initially reported to the emergency room doctor that she was assaulted by two men; interviewing the controller at the nonprofit organization where Appellant previously worked and confirming both, that Appellant had a key to the van identified

10. The *Mason/Melendez* rule requires only that information which was obtained in a prior illegal search and seizure be kept independent of a subsequent effort to secure a warrant; thus, Detective Evans was not barred from utilizing information which Detective Johnson previously acquired in his investigation, and which was untainted by the illegal seizure of Appellant's blood.

as used in the assault, and, also, that the key was not returned after he left the employ of the organization; corroborating that Robert Hawkins, who was previously identified by an eyewitness as the person who abducted the victim, was Appellant's stepson and was with him on the day of the crime; and, finally, reviewing the crime lab report which excluded Robert Hawkins as the rapist. In view of these facts, the suppression court's finding that Detective Evans, in conducting his investigation, acted truly independently from Detective Johnson and the original investigative team who obtained the first invalid search warrant was supported by the record.

Under these circumstances, the second blood test results obtained through the execution of that warrant were admissible under the *Mason/Melendez* rule, just as the lower court concluded. This case, therefore, presents no justification to re-assess this rule as the majority has done. Moreover, the majority does not merely "limit" the rule, as it suggests, but, rather, in my view, eviscerates it, which may lead to the very destruction of the exclusionary rule itself—an exceedingly perilous regression in the protection of individual rights which Justice Cappy expressly warned against in *Mason*. I am therefore compelled to concur only in the result reached by the majority in this matter.

Justice BAER joins this concurring opinion.