[J-98-2012] [MO: Per Curiam]

# IN THE SUPREME COURT OF PENNSYLVANIA
## EASTERN DISTRICT

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : No. 638 CAP |
| | : |
| Appellee | : Appeal from the Order entered on |
| | : 08/31/2011 in the Court of Common Pleas, |
| | : Criminal Division of Lancaster County at |
| v. | : No. CP-36-CR-0002324-2000 |
| | : |
| | : |
| TEDOR DAVIDO, | : |
| | : |
| | : |
| Appellant | : SUBMITTED:   August 3, 2012 |

## CONCURRING OPINION

**MR. CHIEF JUSTICE CASTILLE**                    **DECIDED:   December 15, 2014**

I join the Per Curiam Opinion in its entirety.   I write separately for two reasons: (1) to supplement the Opinion's analysis of appellant's claim of trial counsel ineffectiveness in failing to seek the suppression of evidence obtained via warrantless entry into appellant's residence; and (2) to address the role of the Federal Community Defender's Office ("FCDO") in this case, a point stressed by the Commonwealth at the outset of its brief, because it illustrates the mischief occasioned by that entity's tactic of playing the state and federal court systems off against each other.

### I.

Respecting the suppression issue, I agree with Justice Saylor that the PCRA court's alternative holding, premised upon inevitable discovery, is sufficient to require rejection of the claim.   However, I am also persuaded by the Court's exigent circumstances analysis, which I would supplement with the following point.   The Court

states that the "anonymity" of the 911 call (a call later revealed to have been made by appellant's own sister) reporting probable domestic abuse and giving police the address was "not fatal" to establishing exigent circumstances. In my view, even though the caller did not identify herself, the police reasonably could understand the call as being from an ordinary citizen reporting an incident out of concern for another's life and wellbeing. In short, the caller did not suffer from any apparent motive to falsify; there was no *quid pro quo* for the information so provided as there might be, for example, with a criminal informant seeking leniency. Many of the cases involving concerns with anonymous calls involve drug crimes or other circumstances implicating the criminal underworld. "Concerned citizen" calls reporting criminal activity to police, on the other hand, are generally understood as having a modicum of reliability and credibility. See Wayne R. LaFave, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 3.4(a), at 266-73 (5th ed. 2012) (collecting cases and concluding that "when an average citizen tenders information to the police, the police should be permitted to assume that they are dealing with a credible person in the absence of special circumstances suggesting that such might not be the case.").

Of course, any anonymous call may be of dubious worth – the call could be a prank, it could be intended to harass a neighbor, or the report could be premised upon an unsubstantiated hunch. But, counterbalanced against this prospect is that many neighbors and family members wish to go unnamed out of concern for their own safety, should the perpetrator learn who reported him, or for family or neighborhood harmony. See id. at 283-87. That said, in the totality of circumstances, a call like the one made here stands on its own merits and specifics. Ultimately, the context of the information matters. See Commonwealth v. Torres, 764 A.2d 532, 545-48 (Pa. 2001) (Castille, J., concurring and dissenting). In this case, the specifics and context did matter, leading

police straight to the victim, although not in time to save her life. As the Court indicates, the volatility and violence of domestic abuse demands that reports to police, even if anonymous, must be taken seriously and acted upon rapidly. In my view, police did nothing arbitrary, unreasonable, or wrong under these circumstances; the constable not having blundered, there is no reason that the criminal should go free. See Commonwealth v. Henderson, 47 A.3d 797, 808 (Pa. 2012) (Castille, C.J., concurring) (quoting Davis v. U.S., 131 S.Ct. 2419, 2434 (2011), quoting in turn People v. Defore, 150 N.E. 585, 587 (N.Y. 1926) (Cardozo, J.)).

## II.

### A.

In response to an August 15, 2012 order from this Court directing the FCDO to produce a copy of any federal appointment order authorizing it to represent appellant in Pennsylvania state court proceedings, the FCDO admitted in an August 27, 2012 response that it had no such order. Instead, the FCDO attached a copy of a March 7, 2006 federal district court order authorizing the FCDO to represent appellant in pursuit of a "to-be-filed" federal *habeas corpus* petition. The order granted the FCDO 120 days to file that *habeas* petition. Eight years on now, according to the PACER docket in appellant's federal *habeas* matter, which is attached to a filing in this appeal, the FCDO still has not filed any such petition. See Davido v. Beard, No. 2:06-cv-00917 (E.D. Pa. filed Mar. 1, 2006).

But, the FCDO has been busy. After the FCDO's appointment for federal *habeas* purposes, appellant filed a nominally *pro se* petition for relief in the Court of Common Pleas of Lancaster County under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541-9546, on May 31, 2006. On November 9, 2006, the FCDO came out of the

woodwork and entered an appearance in the PCRA court, just before the PCRA's one-year time-bar was set to expire. See Davido v. Pennsylvania, 546 U.S. 1020 (2005) (denying *certiorari* on Nov. 14, 2005)). The FCDO then secured leave to file an amended PCRA petition, which they finally filed with the PCRA court on May 30, 2008, two years after appellant's state collateral challenge commenced.

During this time, while the FCDO actively pursued PCRA relief in our courts, the March 7, 2006 federal court directive that the FCDO file a federal *habeas* petition remained pending. According to the federal PACER docket, it was not until March 28, 2008, that the federal district court vacated the extended deadline it had allowed the FCDO for filing the *habeas* petition. The order vacated the long-since-passed deadline because "[the FCDO] indicated that petitioner anticipates filing a PCRA petition." Order, 3/28/08. Query: why did the FCDO keep the federal petition open, even though it was already pursuing a PCRA petition in state court, and apparently without informing the federal court of the truth? The Commonwealth's brief explains, and the PACER docket corroborates, that the FCDO was abusing the federal discovery process in order to develop state law claims:

> Rather than pursuing post-conviction relief in state court after his judgment of sentence was affirmed, Defendant filed motions in the United States District Court for the Eastern District of Pennsylvania and requested, *inter alia*, that the [FCDO] be appointed to represent him in connection with the anticipated filing of a petition for writ of *habeas corpus*. Attorney Matthew Lawry was subsequently appointed to represent Defendant in connection with the federal case.
>
> Instead of pursuing a petition for writ of *habeas corpus*, however, on June 30, 2006, Defendant filed a motion for discovery indicating that the federal *habeas* petition would challenge the Commonwealth's theory of the cause and manner of death. Specifically, Defendant averred that the victim suffered from a pre-existing condition and injuries that

contributed to her death. **Despite the fact that the issue had not been litigated on direct appeal to this Court, Defendant claimed that he was entitled to discovery in federal court because the "Pennsylvania state courts were given an opportunity to, and did in fact, address this claim**." Defendant's discovery motion was granted and the Commonwealth took an appeal to the Third Circuit Court of Appeals arguing that Defendant was not entitled to discovery prior to actually filing a petition for writ of *habeas corpus*. On January 19, 2007, the Third Circuit dismissed the appeal as interlocutory. In March of 2007, Defendant's attorneys viewed the requested tissue sample slides along with their pathologist.

.... No petition for writ of *habeas corpus* has been filed to date. Prior to filing [an amended] PCRA petition, Defendant requested an order [from the trial court] directing the Commonwealth to produce a copy of the file of Lancaster County Forensic Pathologist Wayne K. Ross who had performed the autopsy on Angela Taylor. On May 18, 2007, the trial court granted the motion and the Commonwealth provided a copy of the file to defense counsel.

Commonwealth's Brief at 3-4 (emphasis supplied).

This maneuver proves two preliminary points respecting the FCDO's tactics: first, the FCDO obviously had no intention of pursuing a federal *habeas* petition before it had exhausted appellee's PCRA rights. Thus, its request for federal discovery was an obvious (and successful) ploy to skirt Pennsylvania law with respect to PCRA discovery, which is embodied by Criminal Rule 902(E)(2): "On the first counseled petition in a death penalty case, no discovery shall be permitted at any stage of the proceedings, except upon leave of court after a showing of good cause." Pa.R.Crim.P. 902(E)(2); see also Commonwealth v. Williams, 86 A.3d 771, 781 (Pa. 2014) ("The rule establishes no discovery as the default, with an exception when good cause is shown by the party requesting discovery."). The FCDO obviously does not like this restriction. Nevertheless, the federal district court, perhaps duped by the FCDO, looked the other

way.   The FCDO certainly knew, if the district court judge did not, that the Commonwealth had no effective federal appellate remedy from a ruling that -- whether intended by the district court or not -- was contemptuous of Pennsylvania state processes and was designed to subvert this Court's rules concerning PCRA discovery.

Second, if Pennsylvania courts had already decided appellant's federal claims arising out of the cause and manner of the victim's death -- as the FCDO represented to the federal court in order to secure extra-PCRA discovery -- those claims would be unavailable on PCRA review.    Yet, in fact, claims respecting the cause and manner of the victim's death are front and center in appellant's PCRA petition, and are renewed on this appeal.    The near-exclusive purpose[1] of federal *habeas* review of state convictions is to pass upon the reasonableness of state courts' determinations of federal constitutional claims that have already been actually and fairly presented to the state courts ("exhausted" in *habeas* parlance).   In conducting *habeas* review, federal courts of course are to confine themselves to the record made, and the presentations made, in the state courts.   See Commonwealth v. Jones, 54 A.3d 14, 19 (Pa. 2012) (Castille, C.J., concurring) ("With very rare exceptions, the point of federal *habeas* review is not to go on fishing expeditions to find new facts and claims not already presented in state court; federal courts are to review only the federal constitutional claims properly presented to state courts, while showing required deference to the reasonable decisions of the sovereign state courts.").   The U.S. Supreme Court recently had to step in with a primer to remind the lower federal judiciary of this bedrock principle in Cullen v. Pinholster, 131 S.Ct. 1388 (2011):

> We now hold that review under [28 U.S.C.] § 2254(d)(1) [(*Habeas* Corpus)] is limited to the record that was

---

[1] There are arcane exceptions not relevant here.

before the state court that adjudicated the claim on the merits. Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of, established law. This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time i.e., the record before the state court.

This understanding of the text is compelled by "the broader context of the statute as a whole," which demonstrates Congress' intent to channel prisoners' claims first to the state courts. Robinson v. Shell Oil Co., 519 U.S. 337, 341 (1997). "The federal *habeas* scheme leaves primary responsibility with the state courts . . . ." [Woodford v. Visciotti, 537 U.S. 19, 27 (2002)]. Section 2254(b) requires that prisoners must ordinarily exhaust state remedies before filing for federal *habeas* relief. It would be contrary to that purpose to allow a petitioner to overcome an adverse state-court decision with new evidence introduced in a federal *habeas* court and reviewed by that court in the first instance effectively *de novo*.

Limiting [Section] 2254(d)(1) review to the state-court record is consistent with our precedents interpreting that statutory provision. Our cases emphasize that review under [Section] 2254(d)(1) focuses on what a state court knew and did. State-court decisions are measured against this Court's precedents as of "the time the state court renders its decision." Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003). To determine whether a particular decision is "contrary to" then-established law, a federal court must consider whether the decision "applies a rule that contradicts such law" and how the decision "confronts the set of facts" that were before the state court. Williams v. Taylor, 529 U.S. 362, 405, 406 (2000) (Terry Williams). If the state-court decision "identifies the correct governing legal principle" in existence at the time, a federal court must assess whether the decision "unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. It would be strange to ask federal courts to analyze whether a state court's adjudication

> resulted in a decision that unreasonably applied federal law to facts not before the state court.

131 S.Ct. at 1398-99.

Moreover, whether it squares with the FCDO's global agenda or not, the fact remains that states retain sovereign power to regulate procedural matters in their courts, including the procedures by which state collateral attacks are pursued. If a defendant believes that state procedural provisions, such as our discovery rules, are unconstitutional (which is the only **federal** objection he could raise), that objection itself must be raised and exhausted in state court. Properly managed by attentive and dutiful federal courts, federal *habeas* review is decidedly not designed to allow a state defendant to subvert state courts – on discovery matters or any other matters. And, of course, it is unethical for a lawyer not only to affirmatively misrepresent the reasons for seeking federal *habeas* discovery, but also to be less than candid about the true reasons for a discovery request. And, it would be doubly offensive if the federal courts were complicit in the undermining, rather than simply being duped by unethical legal ploys.

It is bad enough when a prisoner who has already properly and honestly exhausted his state court remedies proceeds to federal *habeas* review, and then demands and improperly receives additional discovery. See Jones, 54 A.3d at 20 (citing Commonwealth v. Abdul-Salaam, 42 A.3d 983 (Pa. 2012) and Commonwealth v. Abdul-Salaam, 996 A.2d 482 (Pa. 2010), two pre-Cullen FCDO cases where serial PCRA petitions were premised upon federal *habeas* discovery orders). But, the FCDO subversion of our discovery rules suggested by this case is worse: it appears that the FCDO managed to improperly secure discovery from the federal courts before even bothering to file appellant's amended PCRA petition in our courts, and it used the fruit of this ill-gotten federal *habeas* "discovery" in that very amended PCRA petition – all while effectively delaying the case on both tracks.

This end-around is what happens when a dubiously authorized, federally-financed entity such as the FCDO, whose proper role is representing defendants for purposes of ripe federal *habeas* litigation, instead pursues its own collateral agenda, operating stealthily in both court systems, playing one off of the other, creating delays, and looking for ways to subvert state processes. See Commonwealth v. Spotz, 18 A.3d 244, 329-49 (Pa. 2011) (Castille, C.J., concurring, joined by McCaffery, J.) (outlining multiple similar abuses). Tellingly, as indicated by the Majority, when given an opportunity to prove that it did not divert federal taxpayer funds for its state court agenda in cases such as Commonwealth v. Mitchell, 617 CAP, the FCDO has refused to come clean (and has gone to great lengths and pains to do so).

## B.

In the years since the filing of my concurrence in Spotz, multiple additional examples of the FCDO's global agenda in Pennsylvania capital cases have revealed themselves. I addressed the circumstances in painstaking detail recently in a single-Justice opinion disposing of tangential motions the FCDO filed in Spotz, including its request that I withdraw my Concurring Opinion, which I denied. Commonwealth v. Spotz, 99 A.3d 866 (Pa. 2014). In that opinion, I described the extent of the problem posed by the FCDO's comprehensive, obstructionist, and ethically-dubious insinuation of itself into Pennsylvania capital cases:

> Consideration of the post-decisional motions in this case, and intervening developments in other capital matters involving FCDO appearances in state court, have confirmed and heightened the grounded concern with the conduct of the FCDO in this case, and more importantly, with its global agenda in Pennsylvania capital cases. . . . [T]he incremental insinuation of the FCDO into Pennsylvania capital cases has been remarkable in its stealth and pervasiveness. The FCDO has designated itself the *de facto* State Capital Defender's Office, involving itself not only in

virtually all capital PCRA litigation, but also in direct capital appeals, and even, in one instance, as *amicus curiae* on behalf of a foreign nation, Mexico, in support of a Mexican national who murdered three people.   No authority -- state or federal -- appointed the FCDO to take on this statewide role, and no authority has approved the arrangement.   Pennsylvania does not have a statewide capital prosecutor's office; and notably, in a great many capital cases, the chief law enforcement officer of the Commonwealth, the Attorney General, echoed by county prosecutors, has taken the position that the FCDO should not be permitted to continue in Pennsylvania capital cases without proving its specific federal authorization to do so.

In addition to comprehensively involving itself in state capital litigation without any authorization, the FCDO has established its monopoly through means known only to itself.   Remarkably, when directed by this Court to provide simple and modest information confirming a claim that it has not supported its private capital case agenda in Pennsylvania with improperly diverted federal funds, the FCDO response -- the response of these officers of the court, to the Court with supervisory authority over the practice of law in Pennsylvania -- has been refusal and the removal of cases to federal court, ensuring yet more FCDO delay in those capital matters.

The circumstances and obstructionist effect of the FCDO's silent takeover of the capital PCRA defense function in Pennsylvania requires that Pennsylvania reassert control over the litigation of state capital matters. Death penalty opponents, such as the FCDO, can then redirect their efforts to the political arena, where they belong.   This Court has a responsibility for the entire Pennsylvania judicial system, to ensure the delivery of swift, fair, and evenhanded justice in all cases.   We are not obliged to indulge or countenance a group which manipulates and abuses the judicial process in Pennsylvania in the hopes of achieving a global political result that it has failed to secure through the political process.

This restoration of proper authority will leave a void in the short run. But, the void is an opportunity to return capital case advocacy to principled moorings.   The restoration will require that Pennsylvania authorities, including this Court, step up and ensure the provision of the funding, training and resources necessary to ensure that capital defense representation in Pennsylvania fully meets Sixth Amendment standards, with competent, properly compensated and dedicated lawyers who act zealously to advance the cause of their clients, but who act ethically as well, mindful of their duties to the courts and the justice system overall.   I believe the Commonwealth is up to the challenge.

I do not in the least criticize principled representation of indigent capital defendants; such a principled endeavor represents lawyering in the best tradition of the bar. But, [as explained later in the Opinion], the FCDO continues to pursue an agenda beyond mere zealous representation, one which routinely pushes, and in frequent instances, as here, far exceeds ethical boundaries. FCDO lawyers appear in Pennsylvania courts **only** as officers of this Court; consequently, they are answerable to the Court. So long as the organization remains unauthorized to pursue its global agenda by any Pennsylvania authority, and so long as the FCDO refuses to be candid with the Court about its authorization and funding, it cannot be permitted to continue its representation of capital defendants in Pennsylvania, absent a specific federal court order authorizing the specific endeavor in state court in an individual case.

Id. at 866-68 (footnotes omitted).

As explained in Spotz, if the FCDO persists in a war on candor in our courts, this Court has the sovereign power to remove FCDO lawyers from Pennsylvania cases. I suggest to the trial court here that, if and when the FCDO appears before it again, with a serial PCRA petition in hand on appellant's behalf, seeking to delay further, it be removed as counsel.