**[J-83-2019]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 1 WAP 2019 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Superior Court entered June 14, |
| | : | 2018 at No. 1995 WDA 2014, |
| v. | : | affirming the Judgment of Sentence |
| | : | of the Court of Common Pleas of |
| | : | Westmoreland County entered |
| DENNIS ANDREW KATONA, | : | November 10, 2014 at No. CP-65- |
| | : | CR-0002549-2011. |
| Appellant | : | |
| | : | ARGUED:  October 15, 2019 |

**OPINION**

**JUSTICE DOUGHERTY**[1]                     **DECIDED:  OCTOBER 21, 2020**

We granted discretionary review in this case to consider the Superior Court's application of the Independent Source Doctrine as a basis for upholding the trial court's order denying the suppression motion filed by appellant Dennis Andrew Katona.  We also granted review to consider, as a secondary matter, the validity of an intercept order issued under Section 5704(2)(iv) of the Wiretapping and Electronic Surveillance Control Act ("Wiretap Act"),[2] which permits the recording of in-home conversations when only one party consents, so long as the intercept is approved by an authorized prosecutor and the president judge of a court of common pleas finds that probable cause supports the order. Upon review, we conclude the Superior Court properly invoked the Independent Source

---

[1] This matter was reassigned to this author.

[2] 18 Pa.C.S. §§5701-5782.

Doctrine, and therefore do not reach the various statutory and constitutional challenges appellant raises relative to the Wiretap Act.

## I. Background

As appellant's claims concern only the admissibility of the evidence discovered as a result of the execution of a search warrant at his residence on June 29, 2011, we focus our discussion on the facts as set forth in the affidavit of probable cause supporting the issuance of the warrant. That affidavit, which is twenty-one pages long and divided into forty-seven numbered paragraphs, established the following.

In 2009, the Pennsylvania State Police ("PSP") began working with a confidential informant ("CI") who was a member of the Pagan Motorcycle Club. The CI, who had previously provided reliable evidence in other criminal investigations, informed Trooper Matthew Baumgard that appellant was also a member of the Pagans, including serving as its National President in 2009. This information corroborated PSP's own knowledge of appellant as a longtime member of the Pagans who had previously been convicted for organizing an attack in Long Island, New York, against a rival motorcycle club known as Hells Angels.

On April 28, 2011, the CI contacted Trooper Baumgard to alert him appellant had unexpectedly arrived at his house that evening and offered to sell him three one-half ounce packages of cocaine for $650 per package. The CI declined the offer, informing appellant he had just purchased cocaine from "Tony" and that he was dissatisfied with the price and quality of that purchase. The following day, the CI again reached out to Trooper Baumgard, this time to inform him appellant had made a similar unsolicited stop at another Pagan member's house in an attempt to sell the cocaine.

Several weeks later, on May 16, 2011, the CI phoned Trooper Baumgard to inform him appellant had invited the CI to appellant's home. Shortly after arriving, appellant told

the CI he had something to show him and directed the CI to a bedroom at the top of the stairs. There, appellant retrieved a package containing one-half pound of cocaine from a dresser drawer, and explained to the CI he had obtained it specifically for him given his dissatisfaction with "Tony's" product. Appellant offered the entire package to the CI in exchange for $9,800, with the expectation he would pay $5,000 for it later that night with the remainder to be paid over time. The CI took the cocaine, left appellant's home, immediately called Trooper Baumgard and turned it over to the PSP.

Based on this information and the fact the product tested positive for cocaine, the Commonwealth, represented by the Office of the Attorney General ("OAG"), applied for an order authorizing a consensual wiretap that would allow the CI to wear a recording device inside appellant's residence, pursuant to 18 Pa.C.S. §5704(2)(iv).[3] The Honorable John Blahovec of the Court of Common Pleas of Westmoreland County granted the order later that day. Of relevance here, the order authorized continuous interceptions of all in-home conversations for a period of thirty days. *See* Order Authorizing the Consensual Interception of Oral Communications in a Home, 5/16/2011, at 4.

Pursuant to the wiretap order, the CI visited appellant in his home multiple times over the following month and a half and recorded the ensuing conversations.[4] On May 16, 20, 25, and 31, 2011, the CI made various controlled payments to appellant in his home, with the cash having been provided to the CI by the authorities. During each encounter, Trooper Baumgard and his team surveilled appellant's home and, thereafter, met with the CI to retrieve the recording device.

---

[3] We set forth the statutory text of this provision *infra*.

[4] The Commonwealth obtained an extension of the wiretap order after the initial thirty-day period expired.

On June 9, 2011, the CI met with appellant to purchase Pagan T-shirts; Trooper Baumgard asked the CI to inquire during that meeting about purchasing two additional ounces of cocaine. Following the encounter, the CI produced several Pagan T-shirts and a clear vacuum sealed bag containing a white powdery substance which was later confirmed to be cocaine. The CI related to Trooper Baumgard that he had purchased the T-shirts from appellant and that, during their conversation, appellant retrieved the two ounces of cocaine and requested $2,200 for it. Additionally, the CI indicated to Trooper Baumgard that appellant had offered to sell him an ounce of methamphetamine for $1,300. Later that evening appellant arrived at the CI's home, which was under surveillance, and delivered an ounce of methamphetamine in exchange for $1,300.

Similar transactions occurred over the following weeks. On June 13, 2011, the CI made a controlled payment of $1,100 to appellant for the cocaine that was "fronted" on June 9, 2011. On June 15, 2011, in addition to paying another installment for the cocaine supplied on June 9, 2011, the CI purchased two more ounces of cocaine. Although this delivery occurred in a Home Depot parking lot, the CI subsequently paid for the product at appellant's home on June 20, 2011. On June 22, 2011, appellant provided the CI with still more cocaine. Immediately after the CI left appellant's home on this occasion, he provided Trooper Baumgard with four vacuum sealed bags containing two ounces of cocaine, which the CI explained had just been provided to him by appellant.

Finally, on June 27, 2011, the CI made contact with appellant via text message and in the presence of Trooper Baumgard. Arrangements were made for the CI to make a controlled payment of $1,100 for the cocaine that had been fronted to him by appellant on June 22, 2011. Following this meeting in appellant's home, the CI advised Trooper Baumgard that appellant had made statements indicating he would have a quantity of cocaine and methamphetamine in his home on June 29, 2011. On the basis of all this

information — "including interviews conducted with the CI, purchases of controlled substances, controlled monetary payments and information received from members of the [PSP] involved with this investigation and others with expertise in the field of narcotics investigations," Affidavit of Probable Cause, 6/29/2011, at ¶47 — Trooper Baumgard requested and obtained an anticipatory search warrant for appellant's home.

The PSP executed the warrant at appellant's home on June 29, 2011. The search yielded 84.2 grams of cocaine and 99.64 grams of methamphetamine recovered from a United American bank bag and a briefcase located in the master bedroom, as well as an electronic digital scale and documentary proof establishing appellant lived at the home. Appellant was subsequently charged with two counts each of possession of a controlled substance and possession of a controlled substance with intent to deliver.[5]

## II. Procedural History

Appellant filed an omnibus pre-trial motion seeking suppression of all evidence recovered from his home. Among a host of arguments raised in support of that endeavor, appellant argued the wiretap order allowing the in-home recordings of his conversations with the CI was invalid because it impermissibly permitted interception of conversations for a thirty-day period, whereas, in his view, Section 5704(2)(iv) of the Wiretap Act allows for only one intercept per authorizing order. *See* Omnibus Pre-Trial Motion, 3/22/2012, at 3. As such, appellant further argued that "[a]ny alleged probable cause related to the issuance of the search warrant in question was fatally tainted by the inclusion of evidence related to the illegally . . . monitored conversations[.]" *Id.* at 6. The trial court denied appellant's suppression motion and the case proceeded to a stipulated non-jury trial. Thereafter, the trial court found appellant guilty of all charges and sentenced him to forty to eighty months' incarceration.

---

[5] 35 P.S. §§780-113(a)(16), (30).

Appellant challenged the denial of his suppression motion on direct appeal. *See Commonwealth v. Katona*, 191 A.3d 8, 11 (Pa. Super. 2018) (*en banc*), *appeal granted*, 200 A.3d 8 (Pa. 2019) (*per curiam*). As he did in his written motion, appellant argued that since Section 5704(2)(iv)[6] uses the term "interception" as phrased in the singular, an order

---

[6] Section 5704 provides as follows, in relevant part:

### § 5704. Exceptions to prohibition of interception and disclosure of communications

It shall not be unlawful and no prior approval shall be required under this chapter for:

. . .

(2) Any investigative or law enforcement officer or any person acting at the direction or request of an investigative or law enforcement officer to intercept a wire, electronic or oral communication involving suspected criminal activities, including, but not limited to, the crimes enumerated in section 5708 (relating to order authorizing interception of wire, electronic or oral communications), where:

. . .

> (ii) one of the parties to the communication has given prior consent to such interception. However, no interception under this paragraph shall be made unless the Attorney General or a deputy attorney general designated in writing by the Attorney General, or the district attorney, or an assistant district attorney designated in writing by the district attorney, of the county wherein the interception is to be initiated, has reviewed the facts and is satisfied that the consent is voluntary and has given prior approval for the interception; however, such interception shall be subject to the recording and record keeping requirements of section 5714(a) (relating to recording of intercepted communications) and that the Attorney General, deputy attorney general, district attorney or assistant district attorney authorizing the interception shall be the custodian of recorded evidence obtained therefrom;

> . . .

> (iv) [or] the requirements of this subparagraph are met. If an oral interception otherwise authorized under this paragraph

issued pursuant to that section authorizes only one intercept, as a matter of both statutory and constitutional law. *Id.* at 15. With respect to this latter constitutional assertion, appellant relied heavily on our decision in *Commonwealth v. Brion*, 652 A.2d 287, 289 (Pa. 1994) (declaring citizens have an expectation of privacy in conversations that occur in their homes and that such conversations may not be intercepted without a prior determination of probable cause by a neutral judicial authority).[7] In appellant's view, the interception of each communication after the first one was analogous to multiple executions of a single search warrant and, thus, amounted to an unconstitutional search. *Katona*, 191 A.3d at 15.

The OAG disagreed with appellant on all fronts. As the OAG saw it, a proper statutory analysis leads to the conclusion that a wiretap authorized under Section 5704(2)(iv) is effective for the same duration as a nonconsensual wiretap authorized under Section 5708 of the Wiretap Act, which shall not exceed a period of thirty days. 18 Pa.C.S. §5712(b). From the OAG's perspective, since the Wiretap Act permits a

> will take place in the home of a nonconsenting party, then, in addition to the requirements of subparagraph (ii), the interception shall not be conducted until an order is first obtained from the president judge, or his designee who shall also be a judge, of a court of common pleas, authorizing such in-home interception, based upon an affidavit by an investigative or law enforcement officer that establishes probable cause for the issuance of such an order. No such order or affidavit shall be required where probable cause and exigent circumstances exist. For the purposes of this paragraph, an oral interception shall be deemed to take place in the home of a nonconsenting party only if both the consenting and nonconsenting parties are physically present in the home at the time of the interception.

18 Pa.C.S. §5704(2).

[7] The Superior Court has previously explained that Section 5704(2)(iv) of the Wiretap Act was added as a direct response to our opinion in *Brion*. *Commonwealth v. Fetter*, 770 A.2d 762, 766 (Pa. Super. 2001). We agree with this assessment.

nonconsensual wiretap for thirty days, it necessarily follows that a consensual recording is constitutionally permissible for at least the same length. *Katona*, 191 A.3d at 15. The OAG also highlighted the impracticalities of appellant's interpretation, arguing it would place an onerous burden on law enforcement by requiring them to seek a new order each time the target of an investigation happened to momentarily step outside his residence while the consenting party remained present. *Id.* Alternatively, the OAG maintained that even if all interceptions made after the initial one were invalid, the search warrant was still supported by probable cause wholly independent of the intercepted conversations. *See id.* ("even if no recording device had been used in this case at all, the observations of the Troopers and the information relayed to them by the CI . . . would still have established probable cause") (internal quotations and citation omitted). In other words, the OAG believed that the firsthand observations of law enforcement and the CI provided an independent, untainted source for the probable cause basis supporting the warrant.

Ultimately, the Superior Court determined the parties' focus on the statutory text of Section 5704(2)(iv) and our opinion in *Brion* overlooked a critical distinction: the fact that appellant "seeks to suppress **information**, not the recordings." *Id.* at 16 (emphasis in original). After surveying the relevant federal law, the court explained that, for purposes of the Fourth Amendment, "there is no constitutional issue when a person, such as the CI herein, enters the home of a citizen and records the conversations" because "the speaker has voluntarily disclosed information, and the speaker cannot claim a reasonable expectation of privacy in either the information **or** a simultaneous recording of that information." *Id.* at 19 (emphasis in original); *see also id.* at 16-19 (discussing *Hoffa v. United States*, 385 U.S. 293 (1966), *Katz v. United States*, 389 U.S. 347 (1967), and *United States v. White*, 401 U.S. 745 (1971)).

The Superior Court then considered the greater protections afforded by Article I, Section 8 of the Pennsylvania Constitution and, more specifically, our pronouncement in *Brion* that there is an expectation of privacy in conversations that take place within one's home, such that they may be recorded only after a finding of probable cause by a neutral judicial authority. *See id.* at 19-20. In this regard, the court deemed it significant that, in contrast to the present appeal, Brion filed a timely motion to suppress **the tape recording** of the transaction between himself and the informant in that case. *See id.* at 19. Given this distinction, the Superior Court determined that, while *Brion* stands for the proposition that a citizen has a reasonable expectation of privacy that his conversations will not be recorded by his guests and that the actual recordings are thus subject to suppression, it does not "invariably follow that the information itself is likewise subject to suppression." *Id.* at 20.

To bolster its position, the Superior Court relied upon our subsequent decision in *Commonwealth v. Rekasie*, 778 A.2d 624 (Pa. 2001), wherein we "distinguished *Brion* and permitted the introduction of the actual recorded conversations, based on the fact that there was no reasonable expectation of privacy in the phone conversation." *Katona*, 191 A.3d at 21; *accord Rekasie*, 778 A.2d at 632 (phone calls are "[q]ualitatively different than a face-to-face interchange occurring solely within the home in which an individual reasonably expects privacy and can limit the uninvited ear"). In the Superior Court's view, the present appeal presents an issue not addressed in *Rekasie*: whether a defendant is entitled to suppression of the substance of a conversation that took place in his home, assuming *arguendo* that the simultaneous recording of that conversation violated the defendant's constitutional rights as established in *Brion*. *See id.* at 22; *see also id.* ("More specifically, the question is whether the affidavit of probable cause could lawfully include the **information** learned from [a]ppellant's conversations with the CI, even if the

conversations were unlawfully recorded.") (emphasis in original). The Superior Court answered that question in the negative:

> [W]e find that the Commonwealth received the information twice: once when the CI told the officers that which [a]ppellant voluntarily disclosed, and a second time when the CI performed a search by capturing [a]ppellant's actual words on tape. *Brion* and the Pennsylvania Constitution dictate that [a]ppellant had a reasonable expectation of privacy that his words would not be recorded, but we find that [a]ppellant had no reasonable expectation of privacy with respect to the information itself, which he freely disclosed to the CI, who in turn relayed the information to the authorities.

*Id.* In short, the Superior Court "decline[d] to extend an expectation of privacy to the information itself" because appellant "took the risk that the CI was acting on behalf of the Commonwealth, and as a result had no reasonable expectation of privacy in what he said and showed the CI." *Id.* at 22-23 (citation omitted).

Having concluded the information itself was not suppressible, the Superior Court proceeded to consider whether, after removing the allegedly illegal recordings from the equation, the Commonwealth lawfully obtained everything else appellant relayed to the CI — *i.e.*, whether the information served as an independent source for the search warrant. *See id.* at 23, *citing Commonwealth v. Santiago*, 160 A.3d 814, 827 (Pa. Super. 2017), *aff'd*, 209 A.3d 912 (Pa. 2019). Because the search warrant "did not rely upon evidence derived from an unlawful wiretap, but rather the information disclosed to the authorities, which happened to also be recorded[,]" the court found appellant's voluntary disclosures to the CI properly served as an independent source. *Id.* at 23. Consequently, the Superior Court held suppression of the evidence was unwarranted.[8]

---

[8] In reaching its conclusion, the Superior Court was careful to note it was not holding that the multiple intercepts were consistent with *Brion*; given the court's disposition, it also declined to resolve the statutory issue concerning Section 5704(2)(iv). Instead, the court merely acknowledged that the parties presented reasoned arguments respecting the statutory issue and opined that the "lack of statutory direction on this point is a matter for the Legislature." *Katona*, 191 A.3d at 23.

The Honorable Anne E. Lazarus, joined by the Honorable Jacqueline O. Shogan, dissented. The dissent argued that the *en banc* majority's application of the Independent Source Doctrine was not appropriate because this Court has held that application of the doctrine "'is proper only in the very limited circumstances where the 'independent source' is truly independent from both the tainted evidence and the police or investigative team which engaged in the misconduct by which the tainted evidence was discovered.'" *Id.* at 27 (Lazarus, J., dissenting), *quoting Commonwealth v. Melendez*, 676 A.2d 226, 231 (Pa. 1996). Given its determination that the present circumstances do not satisfy the demands of *Melendez*, the dissent proceeded to analyze the propriety of the consensual wiretap order and concluded a separate finding of probable cause was required for each in-home intercept under Section 5704(a)(iv). *See id.* at 30.

We granted discretionary review to consider two issues: (1) whether the *en banc* Superior Court's decision "conflicts with and renders meaningless this Court's definition of the Independent Source Doctrine as set forth in [*Melendez*]"; and (2) if so, whether our decision in *Brion* or Section 5704(2)(iv) of the Wiretap Act "require judicial approval (*i.e.* a separate warrant or order) for each separate entry of either a law enforcement agent or CI who is seeking to record private conversations within a defendant's residence." *Commonwealth v. Katona*, 200 A.3d 8 (Pa. 2019) (*per curiam*).

### III. Discussion

#### a. Arguments of the Parties

Appellant first argues the Superior Court's application of the Independent Source Doctrine to the facts of his case not only exceeds the bounds of the doctrine as previously embraced by this Court's precedents, but constitutes an "unwarranted expansion" of the

doctrine altogether. Appellant's Brief at 17.[9] Echoing Judge Lazarus's dissent below, appellant emphasizes the fact that *Melendez* requires that the proposed alternative source of evidence must be independent from both the tainted evidence and the police or investigative team that engaged in the misconduct. *See id.* at 18-20 (discussing *Melendez*, 676 A.2d at 257-58). Appellant finds it "difficult to see" how the Superior Court could have determined the *Melendez* standard was met where "the same police who sent the CI into [his] home to illegally record the multiple conversations were then allegedly involved in debriefing the same CI[.]" *Id.* at 19-20. On a related note, appellant submits the lower court was incorrect in its assertion that the record reflects that the CI was debriefed by Trooper Baumgard or otherwise independently relayed any information relating to the drug transactions that occurred in appellant's home. *See id.* at 25-26. In appellant's telling, none of the paragraphs in the affidavit of probable cause, save for one, "make a single reference to the CI discussing with the police what was said to him" while present in appellant's home. *Id.* at 26-27.

The OAG broadly counters that, regardless of the presence or absence of the recordings, the warrant was supported by an independent probable cause basis as reflected on the face of the affidavit. *See* OAG's Brief at 9. With respect to *Melendez* in particular, the OAG posits that, since that case dealt with the seizure of tangible evidence which "can be seized only once and by only one means[,]" it is not an apt analogy to the present circumstances. *Id.* at 11. Instead, the OAG directs us to our recent decision in *Santiago*, *supra*, which the OAG reads to "stand for the proposition that if a piece of information is obtained in two different ways, one of which is deemed permissible and one of which is not, absent a showing that the improperly obtained information somehow

_____

[9] For purposes of his first issue, appellant presumes his challenge to the validity of the wiretap order is meritorious. We do the same.

contaminated the untainted, suppression of this underlying information is not warranted." *Id.* at 13-14. Applying that understanding here, the OAG argues that while an illegal wiretap could rightfully be excluded, "there is no basis for a blanket exclusion of the information itself merely because one of multiple avenues by which it came into the Commonwealth's possession is subsequently deemed to have been improper." *Id.* at 14; *see id.* at 21 ("The fact that the [CI]'s interactions with [appellant] were also covertly recorded pursuant to a court order should not be held to somehow retroactively strip the police of the authority they undoubtedly had to send in an unwired informant if the court order is subsequently deemed to have been improper."). Finally, the OAG refutes appellant's claim that the affidavit does not independently establish probable cause when stripped of all references to the recordings. According to the OAG, the affidavit "makes clear not only that the [CI] did, in fact, verbally relay to law enforcement what was told to him by [appellant] during their meetings, but that the [CI] also produced corroborating physical evidence that he had obtained from [appellant]." *Id.* at 17. To that end, the OAG points us to several paragraphs in the affidavit which it believes appellant has apparently overlooked, and it concludes those paragraphs "clearly establish a nexus between [appellant]'s residence and illegal activity." *Id.* at 17-19.

### b. Analysis[10]

In the first quarter of the twentieth century, the United States Supreme Court announced what is now known as the Independent Source Doctrine. *See Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920) (evidence discovered through illegal means does not render the facts thus obtained "sacred and inaccessible"; rather,

---

[10] Whether the Independent Source Doctrine presents a viable basis for affirming the denial of appellant's suppression motion presents a pure question of law over which our standard of review is *de novo* and our scope of review is plenary. *Santiago*, 209 A.3d at 919.

"[i]f knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it in the way proposed"). Since then, the High Court has repeatedly reaffirmed the doctrine's sustainability, *see, e.g.*, *Nardone v. United States*, 308 U.S. 338, 341 (1939), and, more recently, has described its underlying rationale as follows:

> [T]he interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse, position that they would have been in if no police error or misconduct had occurred. When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation.

*Nix v. Williams*, 467 U.S. 431, 443 (1984) (internal citations and footnote omitted); *see also Murray v. United States*, 487 U.S. 533, 542 (1988) (Independent Source Doctrine rests "upon the policy that, while the government should not profit from its illegal activity, neither should it be placed in a worse position than it would otherwise have occupied"). To enforce that purpose, the Court has explained that "[s]o long as a later, lawful seizure is genuinely independent of an earlier, tainted one . . . there is no reason why the independent source doctrine should not apply." *Murray*, 487 U.S. at 542.

Our most firm initial approval of the Independent Source Doctrine in Pennsylvania appears in *Commonwealth v. Melilli*, 555 A.2d 1254 (Pa. 1989). There, citing *Silverthorne Lumber*, we briefly stated that "[i]f the prosecution can demonstrate that the allegedly tainted evidence was procured from an independent origin — a means other than the tainted sources — the evidence will be admissible." *Melilli*, 555 A.2d at 1262. It was not until four years later, however, that we cemented the Independent Source Doctrine's place in our jurisprudence and adopted the specific teachings of *Murray*.

In *Commonwealth v. Brundidge*, 620 A.2d 1115 (Pa. 1993), a motel manager allowed a state trooper to enter a guest room after the occupant's registration had expired

and a housekeeper discovered a suspicious diagram of the motel's floor plan on the bed. Once inside, the trooper observed indicia of criminal activity in plain sight. He then proceeded to search the pockets of a jacket found inside of a protective bag in a closet. After finding cocaine in one of the pockets, the trooper sought a warrant based on what he observed in plain sight only. The warrant subsequently issued and the trooper seized the items he observed in plain sight as well as the cocaine. The trial court denied Brundidge's motion to suppress the cocaine, and he was convicted of multiple drug-related crimes. The Superior Court reversed, finding that although the entry into the motel room did not infringe on Brundidge's Fourth Amendment rights, the warrantless search of the jacket did.

On appeal, we agreed with the Superior Court that while a guest in a motel or hotel room has a legitimate expectation of privacy during the period of time it is rented, no such expectation exists in the room or in any item in plain view to anyone readying the room after checkout time for the next occupant. However, we also agreed that a motel guest has a reasonable expectation of privacy in the contents of concealed personal effects found in the room even after checkout time. Still, we refused to suppress the cocaine, concluding that it was admissible under the Independent Source Doctrine as defined in *Murray*. We explained that *Murray* devised a two-prong inquiry for determining whether evidence is admissible under the Independent Source Doctrine: "(1) whether the decision to seek a warrant was prompted by what was seen during the initial entry; and, (2) whether the [issuing] magistrate was informed at all of the information." *Brundidge*, 620 A.2d at 1119. Because the trooper did not mention the cocaine in the affidavit of probable cause in support of the warrant, we concluded the cocaine would have been discovered by a source independent of the initial illegality — *i.e.*, the trooper's execution of the valid search

warrant. To hold otherwise, we remarked, "would put the police in a worse position than they would have occupied if no violation had occurred." *Id.* at 1120.

Shortly after we decided *Brundidge*, we considered the application of the *Murray* standard in the context of an Article I, Section 8 challenge based on the warrantless search of a residence. In *Commonwealth v. Mason*, 637 A.2d 251 (Pa. 1993), officers surveilling an apartment as part of an undercover investigation into drug trafficking sent a CI into the apartment to make a controlled purchase of cocaine. Upon his return, the CI told the officers that he successfully completed the purchase, that there was more cocaine present inside, and that multiple other persons were in the apartment making similar illegal transactions. Based on this information, one officer left to obtain a search warrant for the apartment while the others remained to continue their surveillance. Before the officer returned with the warrant, another officer directed the team to forcibly enter the apartment in order to secure the occupants and any evidence which might be present. The officers found Mason inside the bathroom with her hands in the toilet bowl, next to which they observed various drug paraphernalia. The officers also discovered cocaine in plain view in one of the bedrooms. After the warrant arrived, the officers searched the residence more thoroughly, discovering additional drugs, paraphernalia, and other indicia of drug trafficking.

We granted review to consider whether the trial court properly rejected Mason's request for suppression based on a purported violation of Article I, Section 8. In that vein, Mason urged that if we were inclined to recognize the Independent Source Doctrine in our jurisprudence, we should impose "special limitations" on the doctrine "where private dwellings are concerned and where police conduct is undertaken in bad faith." *Mason*, 637 A.2d at 253. For its part, the Commonwealth countered that the Independent Source Doctrine is compatible with the Pennsylvania Constitution and that we have previously so

held. *Id.* Moreover, the Commonwealth claimed the doctrine clearly applied to the factual circumstances at hand because the initial police entry did not taint the subsequent search with the warrant, as the warrant was obtained through probable cause independent of the initial police entry. *Id.*

Preliminarily, we agreed with the Commonwealth that the Independent Source Doctrine applies in Pennsylvania, and we acknowledged that if Mason's claim were made strictly under the Fourth Amendment, we would be constrained to find that suppression was not warranted. *See id.* at 254, *citing Segura v. United States*, 468 U.S. 796, 805 (1984) (where police forcefully entered a dwelling without a warrant and observed contraband in plain view, suppression of the contraband not required where it was later seized pursuant to a warrant obtained based on information which had nothing to do with the warrantless entry; "it is clear from our prior holdings that 'the exclusionary rule has no application [where] the Government learned of the evidence 'from an independent source.'"") (quoting *Wong Sun v. United States*, 371 U.S. 471, 487 (1963)). However, we also recognized the precise question presented was whether the doctrine was applicable "**to these facts**." *Id.* at 255 (emphasis added). In that regard, we noted it is "axiomatic . . . that once a judicially created rule is promulgated, the common law system requires that appellate courts consider this rule in its various factual guises and expand or contract the rule as justice requires." *Id.* Along those lines, we further explained how the exact significance of varying factual situations from case to case "is apparent only upon a more detailed consideration of Pennsylvania's view of the protections which have traditionally been associated with the Fourth Amendment." *Id.*

Our focus ultimately fell on the enhanced protections afforded by Article I, Section 8 of the Pennsylvania Constitution. We explained that unlike its federal counterpart, which has a singular purpose of deterring police misconduct, Article I, Section 8 goes

further by "safeguard[ing] privacy and the requirement that warrants shall be issued only upon probable cause[.]" *Id.* at 256. Taking into account the aims of Article I, Section 8 and the vastly different factual scenario presented,[11] we held that "where police seize evidence in the absence of a warrant or exigent circumstances by forcibly entering a dwelling place, their act constitutes a violation of Article I, Section 8 . . . and items seized pursuant to their illegal conduct may not be introduced into evidence in a subsequent criminal prosecution." *Id.* at 257; *see id.* at 256 ("Where the police battering ram is at the door, without exigent circumstances and without a warrant, it is plain that the violent shattering of the door constitutes an unconstitutional invasion of privacy of which every person in this Commonwealth may complain.").

Then-Justice Cappy concurred and wrote separately to express his continuing disagreement with our prior decision in *Brundidge*, in which he dissented. In his view, an expansive application of the Independent Source Doctrine contravenes the clear purpose of Article I, Section 8 and "undermines the fundamental principle that the admissibility of evidence discovered during a warrantless entry without exigent circumstances is the **exception** to the rule rather than the rule itself." *Id.* at 257 (Cappy, J., concurring) (emphasis in original). According to Justice Cappy, the Independent Source Doctrine should apply only in "the very limited circumstances where the 'independent source' is truly independent from both the tainted evidence and the police or investigative team

---

[11] Notably, we found "significant factual differences" between *Brundidge* and *Mason*:

> First, in the present case, the place of invasion is a dwelling place, whereas in *Brundidge* it was a motel room for which registration had expired; second, the mode of entry in the present case was a battering ram, but in the *Brundidge* case, the trooper simply walked through the open door; third, in the present case, there was no reasonable explanation for battering down the door before the warrant arrived, but in the *Brundidge* case, the trooper entered the motel room after checkout time at the invitation of the manager.

*Mason*, 637 A.2d at 255 (footnote omitted).

which engaged in the misconduct by which the tainted evidence was discovered." *Id.* at 257-58 (emphasis omitted). "Only such limitations on the doctrine," he argued, "can effectively protect from the possibility that police might engage in misconduct without fear of consequence." *Id.* at 258.

Only three years later, in *Melendez*, we revisited the application of the Independent Source Doctrine in the context of a warrantless entry of a residence. In that case, as a result of a three-week investigation into possible drug activity occurring within Melendez's house, officers at the scene communicated with officers at another location in an effort to secure a search warrant for the premises. Before the warrant was obtained, Melendez left the house, entered a vehicle, and began to drive away. The officers stopped her and removed her from the car. A search of her purse revealed a handgun, a large amount of cash, and what the officers described as a drug tally sales sheet. The officers then transported Melendez back to her house and used her keys to gain entrance. Inside they observed a man holding a bag of cocaine. The officers secured the residence and waited for the search warrant for approximately an hour. When the warrant finally arrived, the officers searched the house and found drugs, cash, and other evidence of criminal activity. Melendez was subsequently convicted of various drug and gun charges after the trial court denied her motion to suppress the evidence.

Melendez argued on appeal that the warrantless entry into her home was illegal, thus requiring suppression of all evidence obtained pursuant to the search warrant. Relevant for our purposes, the Superior Court held the evidence was admissible under the Independent Source Doctrine. On further review, we disagreed. Citing *Mason*, we explained that although our precedents recognize the Independent Source Doctrine, the forcible entry into a dwelling place without a warrant or exigent circumstances violates Article I, Section 8. *Melendez*, 676 A.2d at 231. We further saw fit to adopt the limitations

proposed by Justice Cappy in *Mason*, and held that application of the Independent Source Doctrine is proper only "'in the very limited circumstances where the 'independent source' is truly independent from both the tainted evidence and the police or investigative team which engaged in the misconduct by which the tainted evidence was discovered.'" *Id*., *quoting Mason*, 637 A.2d at 257-58. Applying that new rule to the facts in *Melendez*, we concluded the Independent Source Doctrine did not apply, as there was no source of evidence that was truly independent of either the tainted evidence or the police who engaged in the misconduct. We explained,

> Government agents may not enter private dwellings through the use of battering rams as in *Mason*, or by effecting illegal stops and seizures as in this case, and secur[ing] the premises . . . while police wait to learn whether their application for a warrant has been approved. It is difficult to imagine practices more inimical to the fundamental idea that no person shall be subject to unreasonable searches and seizures.

*Id*. at 231-32.

As the above cases demonstrate, this Court has occasionally refined the contours of the Independent Source Doctrine's applicability in this Commonwealth to account for novel factual circumstances in claims arising under our state charter. While we initially paralleled the federal analysis, through our decisions in *Mason* and *Melendez*, we have imposed additional constraints on the doctrine's applicability to safeguard our citizens' right to privacy in their dwellings, particularly where police violate those rights though intentional misconduct. However, the parties and the Superior Court in this case have all overlooked yet another important decision in this evolving line of jurisprudence: our decision in *Commonwealth v. Henderson*, 47 A.3d 797 (Pa. 2012). For the reasons that follow, we conclude our decision in *Henderson* is dispositive of this matter.

The circumstances in *Henderson* involved application for a search warrant to obtain DNA from the defendant, Calvin Henderson, a suspect in a violent rape-kidnapping case. A detective with the sexual assault unit prepared an affidavit in support of probable

cause, secured a magistrate's approval of a search warrant, and collected samples of Henderson's DNA, which ultimately implicated him in the crimes. After his arrest, Henderson lodged a pretrial motion to suppress on the ground that the detective's affidavit was insufficient to establish probable cause. The motion evidently raised concerns on the prosecution's part, as a decision was made to secure a second warrant with the intent of invoking the Independent Source Doctrine. To that end, another detective within the sexual assault unit was tasked with undertaking a probable-cause investigation to support a second search warrant. The second detective spoke with the first detective, reviewed the existing case file and medical records, inquired into Henderson's background, and interviewed one collateral witness. He then applied for and secured a second warrant to seize additional blood samples from Henderson. Henderson responded by filing a second suppression motion in which he alleged the second warrant was not the product of an independent source. After the trial court denied suppression, Henderson was convicted of the charged offenses and the Superior Court affirmed on appeal.

We granted review to consider "whether the independent source doctrine validates a serial search warrant obtained from a second investigation conducted by a police officer from the same department." *Henderson*, 47 A.3d at 800. The Court, in an opinion authored by then-Justice (now-Chief Justice) Saylor and joined in full by former Chief Justice Castille and former Justices Eakin and McCaffery,[12] noted the Commonwealth did not contest that the second investigation failed to meet the *Melendez* requirement of "true independence," but nevertheless "advocate[d] the application of a less exacting standard to circumstances that do not involve a knowing circumvention of a suspect's constitutional rights through intentional police misconduct." *Id.* at 802. The Commonwealth urged us

---

[12] As discussed in more detail *infra*, Justice Todd concurred in the result and authored a concurring opinion in which Justice Baer joined. Former Justice Orie Melvin did not participate in the consideration or decision of the case.

to conclude the appropriate standard in the absence of police misconduct is the two-part inquiry initially set forth in *Murray* and adopted by this Court in *Brundidge.  See Brundidge*, 620 A.2d at 1119 (application of Independent Source Doctrine depends on "(1) whether the decision to seek a warrant was prompted by what was seen during the initial entry; and, (2) whether the magistrate was informed at all of the information").

In considering the Commonwealth's request for refinement of the *Melendez* standard, the Court first acknowledged that former Chief Justice Cappy, the architect of the independent-investigative-team requirement, plainly intended "the requirement of true independence . . . to have meant just that."  *Henderson*, 47 A.3d at 803.  The Court also recognized the "sincere intentions underlying the innovation" of the rule, which was bred out of "a heartfelt desire to vindicate the privacy interests of Pennsylvania citizens against unlawful government conduct."  *Id.*  Nevertheless, the Court explained that since "the independent source doctrine lies outside the terms of the Pennsylvania Constitution, the embellishments of *Mason* and *Melendez* represented a form of prophylactic judicial lawmaking[.]"  *Id.*; *see also Mason*, 637 A.2d at 255 ("It is axiomatic, of course, that once a judicially created rule is promulgated, the common law system requires that appellate courts consider this rule in its various factual guises and expand or contract the rule as justice requires.").  As such, the Court determined it was free "to consider whether the broader pronouncements made there are as sensibly applied elsewhere, as new fact patterns are presented diverging from those before the Court in *Mason* and *Melendez*."  *Id.*; *see id.* ("the experience with broadly stated prophylactic rules often has been that they cannot be sustained on their original terms").

The Court proceeded to reassess the value of the *Melendez* requirements as applied to the facts in *Henderson*, and concluded it was "unwilling to enforce a 'true independence' rule in the absence of police misconduct and on pain of the

Commonwealth being forever barred from obtaining non-evanescent evidence connecting [the defendant] with his crimes." *Id.* at 804. The Court held:

> [I]n light of the factual circumstances before the Court in both *Melendez* and *Mason*, we deem it appropriate to limit the independent police team requirement to situations in which the rule prevents police from exploiting the fruits of their own willful misconduct. Where such malfeasance is not present, we agree with the Superior Court that the *Murray* standard strikes the appropriate balance between privacy and law enforcement. Ultimately, we believe the 'twin aims' of Article I, Section 8 — namely, the safeguarding of privacy and enforcement of the probable-cause requirement — may be vindicated best, and most stably, by taking a more conservative approach to the departure this Court has taken from the established Fourth Amendment jurisprudence.

*Id.* at 805 (internal citations and footnote omitted). In reaching this conclusion, the Court explained "[t]he greatest difficulty in the enforcement of a prophylactic rule intended to guard individual liberties is on account of the competing value in society's interest in identifying and punishing wrongdoers[,]" which, among other ways, "is manifested in the context of the independent source rule in the courts' reluctance to put police in a worse position than they were in prior to an irregularity." *Id.* at 804.[13]

---

[13] As noted, Justice Todd authored an opinion concurring in the result but departing from the majority's decision to "radically constrict the applicable scope of [the *Melendez*] rule to only those limited instances in which police engage in the specific egregious police misconduct which was exhibited in those cases — namely, battering down the door of an apartment with a battering ram without probable cause (*Mason*), or unlawfully seizing the owner of a house and using her key to gain entry to her house (*Melendez*)." *Henderson*, 47 A.3d at 809; *see also id.* at 810 ("the majority has truncated the *Mason/Melendez* rule in a sweeping and prospective fashion so that it will henceforth apply only to those narrow subset of cases in which police conduct amounts to 'willful misconduct' or 'malfeasance'"). In Justice Todd's view, the second blood tests obtained through the execution of that warrant were admissible even under the *Melendez* rule and, therefore, there was "no justification to re-asses this rule, as the majority has done." *Id.* at 817.

Former Chief Justice Castille authored a separate concurring opinion which he explained was "primarily to respond to" Justice Todd's concurring opinion and her support for "extension of the *Melendez* rule . . . to embrace factual circumstances . . . where there was no police misconduct." *Henderson*, 47 A.3d at 806 (Castille, C.J., concurring). In this regard, Chief Justice Castille expressed his view that there was no police violation or misconduct at all because "[a] judicial officer erred, as judicial officers occasionally do, in

In sum, *Henderson* confirms the continued viability of the *Melendez* requirements but limits their application to cases of "willful misconduct" or "malfeasance"; absent such circumstances, "the *Murray* standard strikes the appropriate balance between privacy and law enforcement." *Id.* at 805.[14]  The relevant question we must answer first, then, is

assessing probable cause for the first warrant.  That judicial error did not operate to taint the police 'investigative team.'" *Id.* at 808.  Moreover, Chief Justice Castille argued that, to the extent *Melendez* purported to speak to circumstances not involving police misconduct (such as those in *Henderson*), "its prophylactic rule was, by definition, *obiter dicta*." *Id.* at 807.

[14] The dissent goes to great pains to resist *Henderson*'s application to this case.  Among other things, the dissent:  implies we have strayed from the proper bounds of the question presented, *see, e.g.*, Dissenting Op. at 19 ("[t]he Majority does not answer the question as presented"); casts doubt on the reach of *Henderson*'s limitation on *Melendez*, while at the same time offering veiled criticisms of the former's underlying rationale, *see, e.g.*, *id.* at 23 ("I fail to see why *Henderson* should be read to replace one per se rule with another"); remarks we have "exten[ded]" *Henderson*'s holding and adopted a new bright-line rule, *id.* at 26; suggests *Henderson* is merely distinguishable from the instant case, *see, e.g.*, *id.* at 26 ("[u]nlike *Henderson* this case involves a pure Article I, Section 8 claim"); and contends our decision is at odds with our prior rejection of the good faith exception to the exclusionary rule, *see, e.g.*, *id.* at 27 ("applying *Henderson* under these circumstances would severely diminish the force of [*Commonwealth v. Edmunds*, 586 A.2d 887, 899 (Pa. 1991)], which refused to adopt the 'good faith' exception to the exclusionary rule under Article I, Section 8").  Respectfully, we find this litany of arguments unpersuasive.

Initially, as the dissent itself concedes, whether the Independent Source Doctrine applies presents a question of law, *see id.* at 2, and since "*Henderson* is part of our jurisprudence . . . we must apply the law as we have developed it." *Id.* at 19.  We therefore reject the notion we have somehow exceeded the proper bounds of review by invoking *Henderson*. We likewise reject the dissent's attempts to minimize, discredit, and distinguish the rule announced in *Henderson*.  The *Henderson* majority, over a forceful concurring opinion authored by Justice Todd, unequivocally "deem[ed] it appropriate to limit the independent police team requirement to situations in which the rule prevents police from exploiting the fruits of their own willful misconduct." 47 A.3d at 805; *see id.* at 804 ("[W]e are unwilling to enforce a 'true independence' rule in the absence of police misconduct[.]").  Although the dissent would have us hold these statements do not rise to the level of a categorical rule because earlier in the opinion we used the phrase "[i]n the present circumstances," *id.*, there is nothing limiting or remarkable about such a statement; it merely reflects the reality that, as in most search and seizure matters, our understanding of the law is shaped by the particular facts at hand.  *See generally Commonwealth v. Smith*, 77 A.3d 562, 571 (Pa. 2013) (recognizing "the very wording of the constitutional protection lends itself to

whether the conduct at issue herein constitutes "willful misconduct" or "malfeasance" on the part of the police, thereby bringing this case under the purview of the *Melendez* requirements. *Id.* We conclude it does not.

The only "misconduct" appellant alleges in this case is that "six separate 'seizures' or intercepts were made at [his] home on six separate dates over a period of six weeks

---

examinations of particular facts and circumstances in individualized cases"). As such, the dissent's portrayal of our decision herein as extending *Henderson* or adopting a new bright-line rule, is mistaken.

More foundationally, the dissent's various arguments concerning the exclusionary rule, the good faith exception rejected by this Court in *Edmunds*, and principles of deterrence all completely miss the legal mark. The reason is simple: "[T]he exclusionary rule **has no application** [when] the Government learn[s] of the evidence 'from an independent source[.]'" *Wong Sun v. United States*, 371 U.S. 471, 487 (1963) (emphasis added), *quoting Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920). *See also Henderson*, 47 A.3d at 806 n.2 (Castille, C.J., concurring) ("The independent source doctrine does not involve an exclusionary rule 'exception,' such as the good faith exception, but a question of taint from prior illegality, which implicates principles of independence and attenuation. It is not an 'exception' to the exclusionary rule to admit untainted evidence; no rational application of an exclusionary rule would exclude untainted evidence."). It should therefore go without saying that if the exclusionary rule has no application to this case, then it matters not that "'privacy, rather than deterrence, is the primary reason for our exclusionary rule.'" Dissenting Op. at 24, *quoting Commonwealth v. Britton*, 229 A.3d 590, 611 n.8 (Pa. 2020) (Wecht, J., concurring). Along those lines, we disagree with the dissent that our decision in *Henderson*, or in this matter, ignores the holding in *Edmunds*. *See State v. Betancourth*, 413 P.3d 566, 574 (Wash. 2018) (expressly rejecting a claim that the Independent Source Doctrine operates as some sort of "guise for importing a good faith" test into state constitutional analyses); *see also Commonwealth v. Ruey*, 892 A.2d 802, 819 n.3 (Pa. 2006) (Saylor, J., concurring, joined by Castille, C.J.) (applying the Independent Source Doctrine under the particular circumstances was not "in conflict with this Court's decisions eschewing a generalized good faith exception to the exclusionary rule[,]" even though it appeared to contain a good faith component). On a final related note, we disagree with the dissent that "this case involves a pure Article I, Section 8 claim[,]" *id.* at 26, and that "Article I, Section 8 was always at issue[.]" *Id.* at 27 n.10. Our review of the record reveals appellant has never suggested Article I, Section 8 constrains our application of the Independent Source Doctrine — at least not beyond those prophylactic limitations discussed in the cases above. Through its failure to acknowledge this point, the dissent erroneously minimizes the Fourth Amendment's relevance to its analysis while simultaneously overemphasizing Article I, Section 8's heightened privacy protections.

on the basis of one showing of probable cause[.]" Appellant's Brief at 11. As earlier noted, these recordings were made pursuant to a judicially-authorized order following a probable cause determination. From appellant's perspective, this order "was invalid" because Section 5704(2)(iv) of the Wiretap Act supposedly only authorizes one intercept per showing of probable cause. Appellant's Brief at 18. Thus, appellant reasons, the six recordings made after the initial recording were unauthorized, "[a]nd it was these several constitutionally and statutorily improperly recorded events . . . that provide[d] essentially all of any relevant probable cause contained in the search warrant affidavit for [his] home[.]" Appellant's Brief at 37.[15]

Plainly, the "misconduct" alleged in this case is not remotely within striking distance of the egregious misconduct at issue in *Mason* and *Melendez*. *Cf. Henderson*, 47 A.3d at 802 n.9 ("*Mason* involved an illegal invasion into a private dwelling via the use of a battering ram. *Melendez* strongly disapproved a police strategy of creating an 'exigency' by arresting one person outside of a home, then using the arrest as an excuse to enter the premises illegally[.]") (internal citations omitted). In fact, even assuming *arguendo* that appellant's interpretation of Section 5704(2)(iv) is the correct one, it is still hard to see precisely how the police engaged in any misconduct whatsoever when they were operating pursuant to a court order; if anything, as in *Henderson*, the "error" here was "judicial," insofar as a court order explicitly permitted unlimited interceptions of appellant's communications for a period of thirty days. *See id.* at 808 (Castille, C.J., concurring) (positing that judicial errors do not "taint the police 'investigative team'"). But regardless of whether the alleged error here falls at the feet of the judiciary or law enforcement, the

---

[15] Specifically, appellant claims the recordings made on the following dates were unauthorized: May 20, May 25, May 31, June 9, June 22, and June 27, 2011; he does not challenge the first recording made on May 16, 2011. *See* Appellant's Brief at 11.

fact remains that this case does not involve any "willful misconduct" or "malfeasance" at all. Instead, as the OAG succinctly explains,

> the police sought and were granted a court order authorizing an in-home recording, meaning they had sought and were operating under what they believed to be a valid authorization for their activities. The observed or anticipated pattern of rogue and/or bad faith conduct on the part of the police that this Court was clearly so intent on stamping out in *Melendez* through its restrictive interpretation of the independent source doctrine is therefore not present here.

OAG's Brief at 22. Consequently, since this matter does not fall into the narrow subset of cases involving police conduct which amounts to "willful misconduct" or "malfeasance," the *Melendez* requirements are inapplicable.[16]

Harkening back to the *Murray* standard, we must now determine "(1) whether the decision to seek a warrant was prompted by what was seen during the initial entry; and, (2) whether the magistrate was informed at all of the information." *Brundidge*, 620 A.2d at 1119; *accord Murray*, 487 U.S. at 542 ("The ultimate question . . . is whether the search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence at issue here. This would not have been the case if the agents' decision

---

[16] The dissent at one point asserts that "[e]xclusion of the evidence is the price that must be paid to protect [appellant's] privacy rights." Dissenting Op. at 28; *see also id.* at 22 (arguing "no relief is forthcoming because the Majority holds that the officers could have secured the same evidence even without the recordings"). We stress that the issue in this appeal concerns the Independent Source Doctrine and, in particular, its application with respect to the **search warrant**, not the **recordings themselves**. Below, the *en banc* Superior Court majority appreciated this distinction, as well as the fact that if appellant's Article I, Section 8 rights were actually violated (a question not reached by that court), he would undoubtedly be entitled to suppression of the recordings themselves, which "is no mere constitutional consolation prize." *Katona*, 191 A.3d at 24; *see also id.* ("playing a recorded statement of [a]ppellant's own words, in his own voice, [would be] far more probative and damaging than offering a [confidential informant's] testimony as to the substance of the conversations"). Since it is apparent that there already exists a full remedy for those purported violations, the real result of the dissent's view is that it would **double** those consequences — it would require suppression of not only the recordings themselves, but also of any evidence discovered pursuant to the search warrant, even if, as we conclude below, the warrant served as an untainted and independent source.

to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant.") (footnote omitted). To answer these questions, we need not look beyond the four corners of the affidavit of probable cause.

As noted at the outset, the affidavit in this case is exceedingly long and detailed. Given its length, it is not practical to reproduce the entirety of it here. In any event, doing so is unnecessary as the last few paragraphs alone are illustrative of the affidavit as a whole and dispositive of the questions above. For example, the affidavit states:

> 42. On June 22, 2011, Trooper James Aughinbaugh and Trooper Jeff Mermon met with the CI. Preparations were made with the CI to make a controlled payment of $1100.00 to [appellant] for the Cocaine fronted to the CI on June 15, 2011. In addition this meeting was also to prepare the CI to make another 2 (two) ounce quantity purchase of Cocaine from [appellant]. In the presence of [ ] Trooper Jeff Mermon, the CI made contact with [appellant] by sending him a text message. A response received from [appellant] lead [sic] investigators to believe that he would be at home. After searching the CI and his vehicle, he was provided with $1100.00 in Official Funds, <u>provided with a recording device</u> and followed to [appellant]'s residence at 113 Ember Lane Hermine PA. Surveillance was conducted in the area by members of PSP during the time of the payment and purchase of Cocaine at [appellant]'s residence. After leaving [appellant]'s residence the CI was followed to a predetermined location. <u>Once there the recording device was retrieved from the CI</u>. **Additionally the CI produced 4 (four) vacuum sealed plastic bags containing a white substance, which the CI identified as 2 (two) ounces of Cocaine provided to him by [appellant].** A search of the CI and his vehicle was conducted prior to departing.
>
> . . .
>
> 44. On June 27, 2011 your affiant and Trooper Aughinbaugh met with the CI. Preparations were made with the CI to make a controlled payment of $1100.00 to [appellant] for the Cocaine fronted to the CI on June 22, 2011. In the presence of your affiant, the CI made contact with [appellant] by sending him a text message. A response received from [appellant] lead [sic] investigators to believe that he would be at home. After searching the CI and his vehicle, he was provided with $1100.00 in Official Funds, <u>provided with a recording device</u> and followed to [appellant]'s residence at 113 Ember Lane Herminie PA. Surveillance was conducted in the area by members of PSP during the time of the payment at [appellant's] residence.

After leaving [appellant]'s residence the CI was followed to a predetermined location. <u>Once there the recording device was retrieved</u> and a search of the CI and his vehicle was conducted. **The CI advised that in addition to other conversation [appellant] made statements leading him to believe that he ([appellant]) would be have [sic] a quantity of Cocaine and Methamphetamine at his ([appellant]'s) house on Wednesday (6/29/11).**

. . .

47. Based on the aforementioned information, **including interviews conducted with the CI, purchases of controlled substances, controlled monetary payments and information received from members of the Pennsylvania State Police involved with this investigation and others with expertise in the field of narcotics investigations,** which is believed to be true and correct, your affiant believes there is probable cause supporting the fact that [appellant] is involved with the possession, sale, and distribution of controlled substances particularly Cocaine and Methamphetamine, from his residence of 113 Ember Lane Herminie PA.

Affidavit of Probable Cause, 6/29/2011 (underlining and bolding added).

With respect to whether the Commonwealth's decision to seek a search warrant was prompted by what it learned from the allegedly improper recordings, *see Brundidge*, 620 A.2d at 1119, that question is squarely answered by the bolded contents in paragraph 47 of the affidavit. Notably, Trooper Baumgard explicitly stated he was seeking the warrant based on, *inter alia*, interviews with the CI and the results of multiple controlled buys that he and his team had conducted over the course of more than a month. Even more pointedly, paragraph 44 explains that on June 27, 2011, the CI "advised" Trooper Baumgard, *i.e.*, personally told him, that appellant had made statements indicating he was going to have drugs at his house on June 29, 2011. Trooper Baumgard's own attestations therefore prove the decision to obtain a search warrant for appellant's home on June 29, 2011, was prompted not by any recording made by the CI, but instead by the totality of the evidence he and his team collected over the course of their long-running investigation. As further support, we observe that earlier portions of the affidavit also explain that Trooper Baumgard and his team began investigating appellant for suspected

drug dealing prior to the CI making any recordings. *See id.* at ¶22 ("in the days leading up to the events of May 16, 2011 several instances became known which suggested that [appellant] was currently involved with the sale and distribution of Cocaine"). In light of these various averments, it simply cannot be said that the Commonwealth's decision to seek a search warrant was prompted by the allegedly illegal recordings made by the CI. *See Murray*, 487 U.S. at 542 n.3 ("To determine whether the warrant was independent of [the alleged illegality], one must ask whether it would have been sought even if what actually happened had not occurred[.]").

Resolving the next inquiry — whether the magistrate was informed at all of the allegedly improper recordings, *see Brundidge*, 620 A.2d at 1119 — is a marginally more difficult task. As the underlined portions in paragraphs 42 and 44 above demonstrate, at times the affidavit did reveal to the magistrate that the CI recorded certain conversations with appellant. But, it seems obvious from the underlined passages that such references merely relayed the factual progression of the investigation from the vantage point of Trooper Baumgard, and the affidavit did not otherwise purport to set forth the contents of any of those recorded conversations. Indeed, the only conversations detailed in the affidavit are those that the CI personally relayed to Trooper Baumgard or other members of his investigative team. *See, e.g.*, ¶26 ("The CI said he then left [appellant]'s residence and immediately called to inform your affiant of the situation"); *id.* at ¶34 ("The CI related that he purchased the 'Pagan' shirts from [appellant] and during their conversation [appellant] retrieved the clear bag that contained two ounces of Cocaine from a blue 'money bag.' The CI went on to relate that [appellant] told him he wanted $1100.00 per ounce for a total of $2,200 for the Cocaine."); *id.* at ¶42 ("Additionally the CI produced 4 (four) vacuum sealed plastic bags containing a white substance, which the CI identified as 2 (two) ounces of Cocaine provided to him by [appellant]."); *id.* at ¶44 ("The CI advised

that . . . [appellant] made statements leading him to believe" appellant would have drugs at his "house on Wednesday (06/29/11).").[17] Under these circumstances, it would be unreasonable to conclude the vague and brief references to the CI being "provided with a recording device" and law enforcement subsequently "retrieving" those recordings, in any way "affected [the magistrate's] decision to issue the warrant." *Murray*, 487 U.S. at 542. Accordingly, we conclude the second prong of *Murray* is also met.

As the two-part inquiry established in *Murray* has been satisfied, we agree with the Superior Court that the Independent Source Doctrine may provide a basis for affirming the trial court's denial of appellant's motion to suppress the evidence recovered from his house.[18] The only question that remains is whether the affidavit, when stripped of all references to the allegedly improper recordings, provided the magistrate with probable cause to issue the warrant. *See, e.g.*, *Edmunds,* 586 A.2d at 899 ("The linch-pin that has been developed to determine whether it is appropriate to issue a search warrant is the test of probable cause.") (internal citation and quotation omitted); *see also Commonwealth v. Weidenmoyer*, 539 A.2d 1291, 1296 (Pa. 1988) ("the presence of some improper information in [an] affidavit is not enough to invalidate the search warrant if the warrant is also based upon other competent sources and is sufficient to constitute

---

[17] These quotations directly refute appellant's claim that in all but one paragraph of the affidavit there is not "a single reference to the CI discussing with the police what was said to him in his meeting[s] . . . at [appellant]'s house." Appellant's Brief at 26-27.

[18] We do, however, depart from the Superior Court's analysis in some respects. Whereas the Superior Court "dr[e]w a distinction between a search of those words as contained within the recordings versus a 'search' occasioned by the [CI] hearing the words" and concluded appellant had no reasonable expectation of privacy in the actual substance of his conversations, *Katona*, 191 A.3d 23 n.11, we find it unnecessary to explore this issue further for purposes of this appeal. While the Superior Court's discussion of our decisions in *Brion* and *Rekasie* presents a thoughtful and compelling rationale in support of its view, the instant matter can more simply be resolved through a straightforward application of *Henderson* and *Murray*.

probable cause") (citations omitted). The parties dispute whether this standard has been met. *Compare* Appellant's Brief at 46-47 ("[w]hen [paragraphs 30-34, 38, and 41-44] are redacted from the affidavit, no present probable cause exists") *with* OAG's Brief at 17-19 (contending paragraphs 23, 26, 34, 42, 44, and 47 "clearly establish a nexus between [appellant]'s residence and illegal activity"). We have little hesitation in agreeing with the OAG that the affidavit, even absent all references to the recordings, provided ample probable cause supporting issuance of the search warrant.

As previously noted, multiple paragraphs reveal that the CI successfully completed controlled drug buys at appellant's house, after which the CI turned over the drugs to the police, who had surveilled the encounters. *See, e.g.,* Affidavit of Probable Cause, 6/29/2011, at ¶¶34, 42. Other paragraphs disclose that the CI personally informed the investigative team of the conversations he had with appellant concerning the drug buys. *See, e.g.*, ¶¶34, 44. As well, and as appellant rightfully concedes, all evidence pertaining to the events occurring on May 16, 2011 — the first date on which the CI recorded his interaction with appellant — was properly obtained and therefore must also be considered in the probable cause analysis. Relevantly, the affidavit provides:

> 26. The CI described the location of the bedroom as being in front of them as they reached the top of the steps. Once inside the bedroom the CI described a dresser on the right side of the room; [appellant] reached into the third drawer of the dressed and produced a yellowish colored envelope with two plastic ziplock bags inside. The CI asked [appellant] what as in the bag and [appellant] responded by saying "a ½ pound of coke." The CI told [appellant] that he/she would take two of those (meaning two ounces of cocaine) and [appellant] told him/her to take all of it. The CI recalled [appellant] saying something to the effect of "I just got this for you cause I knew you were unhappy with Tony's stuff being too expensive and 'whacked.'" The CI added that he told [appellant] that they did not want that much cocaine at one time but instead only wanted a couple of ounces. [Appellant] told the CI to take it anyway. The CI said [appellant] quoted the price of $9800.00 for the cocaine. Additionally the CI said the two spoke about the CI's ability to pay [appellant] for the cocaine. [Appellant] said he wanted $4000.00 or $5000.00, preferably $5000.00 paid to him later that night because he was leaving town. Additionally [appellant] said he would

let the rest "ride" for a little while. (Meaning, he agrees to be paid at a later date.) The CI said he then left [appellant]'s residence and immediately called to inform your affiant of the situation.

*Id.* at ¶26. And, perhaps most importantly, Trooper Baumgard attested in paragraph 44 that the CI "advised that . . . [appellant] made statements leading him to believe" appellant would have drugs at his "house on Wednesday (06/29/11)." *Id.* at ¶44. The totality of this information was easily sufficient to establish probable cause for an anticipatory search warrant of appellant's home.

In conclusion, we reaffirm *Henderson*'s limitation on *Melendez*. That limitation is particularly warranted as applied to the factual circumstances of this case so as to avoid "put[ting] police in a worse position than they were in prior to an irregularity." *Henderson*, 47 A.3d at 804; *see also Sutton v. United States*, 267 F.2d 271, 272 (4th Cir. 1959) ("It is one thing to say that officers shall gain no advantage from violating the individual's rights; it is quite another to declare that such a violation shall put him beyond the law's reach even if his guilt can be proved by evidence that has been obtained lawfully."). As the OAG persuasively offers, "[t]o hold otherwise would confer undue benefit on a perpetrator of illegal activities and impose an unfair penalty on law enforcement and, by extension, society." OAG's Brief at 23. We agree and therefore affirm the Superior Court's application of the Independent Source Doctrine in this matter.[19]

---

[19] Given our conclusion that the search warrant was valid and served as an independent source for the evidence obtained from appellant's house, we do not reach the issue of whether an order obtained under Section 5704(2)(iv) of the Wiretap Act permits unlimited interceptions for a period of thirty days. In this respect, we reiterate that appellant has raised both statutory and constitutional grounds in support of that claim. *See, e.g.*, Appellant's Brief at 15. Like the *en banc* Superior Court majority, we find that resolution of this second issue — on either statutory or constitutional grounds — is unwarranted in light of our disposition of the first issue. At the same time, however, we note that we too share in the Superior Court's observation that there is a certain lack of statutory direction on this point, and that additional legislative guidance in this area would be beneficial.

Chief Justice Saylor and Justices Baer and Todd join the opinion.

Justice Mundy files a concurring opinion.

Justice Donohue files a dissenting opinion in which Justice Wecht joins.